NATIONAL POLYMER PRODUCTS,
INC., Plaintiff-Appellant,

v.

BORG–WARNER CORPORATION,
Defendant-Appellee.

No. 79–1256.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1980.

Decided Sept. 14, 1981.

Hal Gerber, James H. Mathis, Gerber, Bernstein, Gerber & Winestone, Tim Edwards, Memphis, Tenn., for plaintiff-appellant.

Newton P. Allen, Jon P. McCalla, S. Russell Headrick, Armstrong, Allen, Braden, Goodman, McBride & Prewitt, Memphis, Tenn., for defendant-appellee.

Before BOYCE F. MARTIN, Jr., Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

CELEBREZZE, Senior Circuit Judge.

National Polymer Products, Inc. appeals from the entry of a judgment notwithstanding the verdict and the conditional grant of a new trial entered in favor of the defendant, Borg-Warner Corporation in this products liability case based on diversity jurisdiction.[1] In its complaint, National Polymer charged Borg-Warner with misrepresentation, negligence and breaches of implied and express warranties in the manufacture and marketing of a plastic raw material known as a Cycopac 920. From June, 1974 to June, 1975, Polymer used Cycopac produced by Borg-Warner to manufacture plastic bottles by a blow-molding process. Polymer contended that the Cycopac was defective and failed to meet the Borg-Warner representations, causing Polymer to experience financial losses from which it could not recover.

After a trial of seven weeks duration, the case was submitted to a jury on 25 interrogatories. The jury answered all interrogatories in a manner favorable to Polymer and assessed damages in the sum of $985,000.00. Borg-Warner then filed a motion for a judgment notwithstanding the verdict, a new trial, or, in the alternative, a remittitur. The district court considered the mo-

---

1. Borg-Warner counterclaimed for payment for materials shipped to National Polymer in the amount of $165,074.53. Polymer failed to file the sworn denial required by Tennessee law and summary judgment was entered for Borg-Warner on September 8, 1977. Polymer has not appealed that order.

tion for JNOV to present a "close question," but ultimately denied that motion. The court did, however, grant Borg-Warner's motion for a new trial after finding the jury's verdict to be against the clear weight of the evidence. Left without a final decision from which to appeal, National Polymer subsequently filed a motion under Rule 60 of the Federal Rules of Civil Procedure to "correct" the court's memorandum decision by entering a judgment NOV for the defendant or, in the alternative, a motion to recuse. The district court granted the motion for judgment notwithstanding the verdict and dismissed the case in favor of Borg-Warner. National Polymer now appeals that dismissal.

## I.

In September, 1970, John C. Prince and Richard H. Rodenbaugh organized National Polymer Products, Inc., a Memphis based corporation, to manufacture plastic bottles. They financed the initial operation of the company with a $110,000.00 loan from the National Bank of Commerce in Memphis, Tennessee, guaranteed by the Small Business Administration (SBA). Polymer's initial production was for Humko Products, the country's largest user of clear plastic bottles for packaging edible oils. Together with three competing companies, Sewell Plastics, Delkay, and Imco Container Corp., National Polymer's two production lines supplied Humko with bottles made from polyvinylchloride (PVC). Increased business with Humko led Polymer to expand the Memphis plant to five production lines. In 1973, at Humko's request, National Polymer constructed a plant in Champaign, Illinois, to satisfy Humko's needs there.

In February, 1972, Polymer was unable to make its scheduled payment with the National Bank of Commerce and began negotiations for an additional loan and a revised payment schedule. As a result of those negotiations, the bank agreed to lend Polymer an additional $315,000.00, with repayments to begin in May, 1973. Later in 1973, Polymer's financial condition deteriorated as a result of the general economic recession, wage and price controls, and the soybean oil shortage which curtailed Humko's bottling operation. In June, 1973, Polymer defaulted in its regularly scheduled payments on its bank loan, and did not resume making payments until December, 1973. By that time, Polymer's financial documents reflected an interim loss and six consecutive months of negative cash flow.

Early in 1974, published scientific reports identified vinyl chloride monomer, an ingredient in PVC, as a potential carcinogen. Humko became concerned with the potential health threat and although PVC was not removed from the FDA approved list for packaging food products, began looking for a substitute material. At the same time in 1974, Polymer's financial condition had continued to deteriorate and on February 11, 1974, the bank requested the Small Business Administration to defer principal payments by Polymer from July, 1973 to June, 1974. A deferral (moratorium) of principal payments until April 1, 1974 was granted. Polymer was also assisted by its ability to sell its excess PVC resin and PVC it had purchased from other sources to a company in Mexico at a profit during the energy crisis caused by the oil embargo of 1973–1974. Although Polymer's year-end reports for 1973 and 1974, prepared by Polymer's accountant, Vance, showed a profit, Borg-Warner's expert financial witness, Weaver, testified that Polymer actually incurred a loss in both years.[2]

When Humko commenced its search to find a replacement material, its attention focused on Cycopac, a high-nitrile polymer manufactured exclusively by Borg-Warner.

---

**2.** Weaver testified that the actual deficits were $1,643.00 for 1973 and $72,262.00 for 1974. And in 1974 Polymer bottlemaking operation sustained a loss of $177,298.00 which was offset only by the non-operating profit from the sale of excess PVC resin. The gravamen of Weaver's recalculations alleging "paper profits" were his opinions that Polymer had overstated income and deleted salary expenses in 1973, and overstated income and improperly credited "prepaid" expenses in 1974, which practices were labeled as violations of generally accepted accounting principles.

Polymer was aware of this search and on March 7, 1974, Rodenbaugh contacted the marketing manager for Borg-Warner's packaging resins division to request that Borg-Warner personnel visit Polymer's plant in Memphis. On March 14, 1974, Rodenbaugh ordered 1,000 pounds of Cycopac from Borg-Warner and scheduled a meeting for March 18 at Borg-Warner's Chemical Division headquarters in Parksburg, West Virginia to learn what he could about Cycopac. At the March 18 meeting, Rodenbaugh was told that the processing characteristics of Cycopac were similar to those of PVC. Rodenbaugh also received a Borg-Warner technical report and a technical data sheet that represented that Cycopac had excellent impact strength (resistance to breakage); that it had glass-like gloss and clarity; and that it complied with the U.S. Food, Drug & Cosmetic Act. The information also indicated that processing Cycopac required drying the material from 4 to 6 hours at 180 degrees because it was hygroscopic, i. e., attracted moisture from the atmosphere. That same day Rodenbaugh spoke by telephone with the manager of Polymer's Memphis plant while the 1,000 pound sample of Cycopac was being run through the molds.[3] On that test run, Polymer encountered substantial bubbles in the finished bottles which were also prone to fracture easily.

On March 21, 1974, Borg-Warner executives met in Memphis, Tennessee with executives of Humko regarding the possible use of Cycopac by Humko in packaging vegetable oil. The principal topics of discussion were Cycopac's FDA status and the availability of sufficient quantities of the materi-

al to satisfy Humko's needs. Humko officials indicated that their bottle application would require three and one-half million pounds of material annually, notwithstanding an earlier statement by Rodenbaugh that Polymer would require six to seven million pounds over the next year.

Borg-Warner had developed Cycopac specifically for food packaging applications and as such needed to comply with the Food, Drug & Cosmetic Act. Although the FDA had never passed on Cycopac's qualification for food packaging, Borg-Warner had two reasons for asserting that it complied with the Act. First, test data showed that Cycopac had low migration (it would not become a part of the food). Alternatively, Borg-Warner contended that Cycopac fell within the "prior sanction" category provided by the FDA for material in use prior to 1954. While Cycopac itself was a new formulation, Borg-Warner's position was that, as a member of the ABS family of Polymer's, Cycopac fell within the ABS category that had FDA approval and therefore enjoyed a prior sanction.[4]

Humko had reservations about Borg-Warner's position. The Board Chairman of Humko, Sam Cooper, telephoned Billy Goodrich, the head of the Shortening Institute and a former FDA General Counsel, regarding Borg-Warner's opinion about Cycopac's FDA status. Goodrich advised Cooper that the prior sanction position with respect to Cycopac was untenable. In a subsequent call, Goodrich again rejected the Borg-Warner opinion, stating that he had contacted an official at the Food and Drug Administration and had been told that a

---

3. Plastic bottles were produced by extrusion blow-molding. A blow-molding machine extrudes a molten tube of plastic that is captured by a mold which closes, cutting the plastic both at the top and bottom and, using compressed air or gas, shapes the captured hollowed plastic into a bottle which is released when the mold opens.

4. If a material qualified for FDA approval under a prior sanction, it enjoyed that status by virtue of a type of grandfather clause. In response to a complaint by one of Borg-Warner's competitors several months later, the FDA questioned the prior sanctioned status of Cyco-

pac. This inquiry prompted Borg-Warner and Humko to make an application for a regulation specifically approving Cycopac for use in bottling vegetable oil. Pending approval of that regulation, Cycopac bottle production was suspended from November 14, 1974 until December 10, 1974. During the interim, National Polymer produced PVC bottles for Humko. The approval of the requested regulation allowed Cycopac production to recommence on December 12, 1974. Rodenbaugh testified that the switch to PVC and back to Cycopac cost Polymer between $5,000 and $10,000.

prior sanction for ABS would not apply for bottles. In light of Goodrich's advisory opinion on the status of Cycopac, the Borg-Warner executives left the meeting believing that Humko would not proceed with Cycopac.

After leaving Humko, the Borg-Warner officials proceeded to Polymer's office where they informed Prince and Rodenbaugh that Humko would probably not proceed with Cycopac because of the FDA issue. Rodenbaugh disagreed with the assessment of the situation. In his view, Humko had no alternative to Cycopac except to use glass, for which the cost and time delay would be prohibitive. Confident that Humko would proceed with Cycopac, Prince and Rodenbaugh proceeded to demonstrate the impact problem encountered in the sample run of March 20 by dropping some of the bottles filled with water; all of the bottles broke when they hit the pavement. Borg-Warner personnel advised Rodenbaugh that he would have to go through a "learning curve" in order to learn how to process Cycopac for good impact resilience. After this discussion, the Borg-Warner personnel were given a tour of National Polymer's Memphis plant. Rodenbaugh testified that the tour lasted one hour, during which the Borg-Warner executives examined the machinery, dryers, molds and material handling equipment. Borg-Warner personnel, on the other hand, stated at trial that the tour was at most a cursory overview, lasting 15 to 20 minutes, and that they did not inspect the facilities but only observed the operations generally.

The Cycopac program was then dormant until March 25, 1974, when Humko informed Borg-Warner of its decision to go forward with Cycopac. Humko notified Polymer of its change in specifications from PVC to Cycopac on April 12, 1974. Indeed, Humko had decided to switch from PVC to another substance even before the March 21 meeting, and the development division of Humko's parent corporation, Kraftco, had ruled out all plastics other than Cycopac. Rodenbaugh realized that if Humko were to proceed with Cycopac, Polymer would be forced to follow suit if it wished to keep Humko as a customer. This cause and effect relationship was clearly expressed in Polymer's answer to an interrogatory when it stated: "The reason National Polymer switched from polyvinylchloride to Cycopac was because its principal customer, Humko Products, changed its specifications from polyvinylchloride to Cycopac."

On May 8, 1974, Rodenbaugh and Prince met with Borg-Warner's Credit Manager for the purpose of establishing a line of credit. Commercial production of Cycopac began in Polymer's plant in the first week of June, 1974. From the very outset of production, Polymer's Cycopac program was plagued by a host of problems. Bubbles appeared in the bottle walls, causing leaks and making them cosmetically undesirable to customers and Humko. The color and clarity of the bottles was inconsistent. Virgin material received from Borg-Warner was found to be contaminated. Cycopac bottles often had very poor impact resistance. Frequent consultations with Borg-Warner representatives apparently failed to mitigate or correct these deficiencies.

In August, 1974, National Polymer's bill for Cycopac reached $146,000.00 and Polymer stopped making payments to Borg-Warner. Rodenbaugh testified that Polymer decided to halt payments because of a general cash-flow problem and because of defective material received from Borg-Warner. In response, Borg-Warner refused to make further shipments to Polymer on credit. Humko, however, decided to purchase Cycopac for Polymer on a 30 day temporary basis so as to allow Polymer to continue production. Dissatisfied with the status of its program, Rodenbaugh attempted to pursuade Humko to abandon Cycopac because of the drying and impact problems. Arthur Macy of Sewell Plastics, a competitor producing bottles for Humko, volunteered to accept all the Humko business he could get. Despite Rodenbaugh's urging, Humko chose to remain with Cycopac and so did Polymer, continuing production until the disruption of November 14, caused by the FDA's temporary ban on Cycopac bottles. During the temporary production of

PVC, Polymer's records indicated that the efficiency of production was virtually the same for Cycopac and PVC. Several of the same problems suffered with Cycopac were experienced with PVC. It was the Cycopac problems, however, that lead Humko to place Polymer on probation. Then, on June 23, 1975, Humko terminated Polymer as a supplier, citing Polymer's inability to adequately supply Humko's needs and the fact that Polymer was no longer priced competitively with other available suppliers. By the end of the fiscal year on June 30, 1975, Polymer had lost over $158,000.00. As of June 30, 1976, Polymer's federal income tax return reflected a loss of $858,000.00.

Polymer not only experienced significant difficulty in processing Cycopac, it experienced significant difficulty in meeting its financial obligations. No principal payments were made on the outstanding bank loan from April, 1974 to February, 1975 and on February 21, 1975, the National Bank of Commerce requested that the SBA fund its portion of the loan. One month later, in March, 1975, Rodenbaugh succeeded in raising additional capital from stockholders and obtained a $400,000.00 loan from Crawford Corporation, which eventually purchased Polymer in a merger on June 18, 1975. After the merger, Polymer continued to produce PVC bottles. In February, 1976, however, Crawford decided to stop putting money into Polymer. National Polymer's collapse followed quickly. The President of Crawford, Mr. Armstrong, testified that under-capitalization and cash-flow problems contributed to the demise of the company.

Cycopac's fate was no better than Polymer's. Humko ultimately stopped using the material, switching to Barex, and later PVC, in response to adverse publicity regarding migration from Cycopac into food products. Although Borg-Warner had de-veloped annual sales of Cycopac of about $5,000,000.00, Borg-Warner officials testified that this volume, relative to the company's other operations, was insufficient to warrant continuing the program. Accordingly, it discontinued manufacture of Cycopac on December 31, 1977.

## II.

At the outset we must consider Borg-Warner's motion to dismiss the appeal in which it argues that this court is without jurisdiction to entertain the appeal because National Polymer, in effect, requested a judgment NOV in favor of the defendant and thereby consented to the entry of a final judgment against it and cannot now appeal from error which it invited. To allow this appeal, Borg-Warner urges, would be to allow National Polymer to confer jurisdiction on this court to review an interlocutory and non-appealable order, i. e., the order granting a new trial, in contravention of the "finality" policy of 28 U.S.C. Sec. 1291.[5]

National Polymer candidly admits that its reason for moving the district court to "correct" its disposition by entering judgment NOV for Borg-Warner was to obtain immediate appellate review of the trial court's decision in light of the court's view of the case outlined in its memorandum decision. National Polymer was satisfied with the proof developed at the first trial and considered a new trial both undesirable and financially impossible; as a bankrupt, it sought only a final ruling on the claims presented at the first trial.

The district court considered National Polymer's motion to "correct" the initial ruling as, in effect, a motion to enter judgment NOV for the defendant. Thus, in dismissing the case in favor of Borg-War-

5. The common avenues for review involve either an order which is reviewable as a final decision, 28 U.S.C. Sec. 1291, or an interlocutory injunctive order subject to review under 28 U.S.C. Sec. 1292(a)(1). Discretionary review of interlocutory orders is allowed under 28 U.S.C. Sec. 1292(b) and the All Writs Act, 28 U.S.C. Sec. 1651(a). Borg-Warner contends that National Polymer could have, but did not, avail itself of Sec. 1292(b). This implies that National Polymer was obligated to attempt to persuade the court to exercise its discretion and review the order granting a new trial, rather than attempting to procure a final order. We know of no such requirement, and in any event the circumstances here would not favor adopting such a requirement.

ner, the court stated: "It appearing to the court, therefore, that both the defendant and the plaintiff have moved for a judgment NOV in favor of defendant...." National Polymer strenuously objects to the characterization of its motion as one for JNOV. In fact, National Polymer argues that it was disqualified from making a motion for JNOV under Rule 50 of the Federal Rules of Civil Procedure for two reasons. First, Rule 50 requires such a motion to be made not later than ten days after the entry of judgment, and here more than ten days had expired between the entry of the district court's memorandum decision and the filing of Polymer's motion. Second, National Polymer had not moved for a directed verdict—under Rule 50 a prerequisite for a subsequent JNOV motion. National Polymer explains that, in addition to being unable to move for JNOV, it chose a Rule 60 motion to correct the verdict in order to avoid the technical objections now raised by Borg-Warner. That motion to correct the verdict was aimed primarily at the inconsistency between the trial court's reasoning and its result. In its memorandum opinion the district court stated that the JNOV issue presented a "close question," but nevertheless denied the motion. Instead, the jury's verdict was set aside as against the clear weight of the evidence. National Polymer argues that a careful reading of the district court's assessment of the particular issues demonstrates that the court really felt that there was *no* evidence to support any of Polymer's myriad claims. Indeed, the trial judge stated that the jury had "missed the boat" on all 25 interrogatories. In that event, Polymer argues, the motion for a judgment NOV should have been granted in the first place. Thus, National Polymer's Rule 60 motion attempted only to align the court's ultimate disposition of the case with the reasoning in its opinion.

█ Borg-Warner has argued that this is not a final judgment susceptible to immediate appellate review under 28 U.S.C. Sec. 1291. We disagree. The trial court's characterization of the motion as one for judgment notwithstanding the verdict is not dispositive. The language in a trial court's decision is not always held to the highest degree of precision. We review the case in its entirety and the language in context, taking care not to attach unwarranted importance to isolated passages. *See, e. g., Smithers v. Bailar*, 629 F.2d 892, 897 (3rd Cir. 1980). The dismissal, though perhaps indirectly and in a very loose sense solicited by National Polymer, was not voluntary. It was a calculated reaction to the inconsistency between the court's ruling and reasoning on the substantive issues.

The Supreme Court has considered and rejected Borg-Warner's argument in a related context. In *Thomsen v. Cayser*, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917), the losing party persuaded the appellate court to dismiss the case rather than remand it for a new trial. Before the Supreme Court the appellee argued that the judgment of the Second Circuit was entered in the form requested by the plaintiffs-appellants and by their consent, and that any errors assigned by appellants were waived by such request and consent. In disposing of this contention the Court stated: "The plaintiffs did not consent to a judgment against them, but only that, if there was to be such a judgment, it should be final in form instead of interlocutory, so that they might come to this court without further delay." 243 U.S. at 83, 37 S.Ct. at 358.

Here, the lower court order granting a new trial was interlocutory and unappealable. National Polymer persuaded the trial court to change its verdict to reflect its reasoning. That alteration produced a final judgment, a dismissal, allowing this appeal to be maintained. *Cf. Raceway Properties, Inc. v. Emprise Corp.*, 613 F.2d 656 (6th Cir. 1980) (plaintiffs solicited formal dismissal of their civil anti-trust suit after an adverse trial court decision on the relevant market which rendered them unable to proceed; appeal allowed since request for dismissal was designed only to expedite review of the order which, in effect dismissed the lawsuit).

## III.

█ In *Reeves v. Power Tools, Inc.*, 474 F.2d 375, 380 (6th Cir. 1973), we stated the

standard applicable to a judgment notwith-standing the verdict:

Judgment notwithstanding the verdict is not proper unless the evidence is such that there can be but one reasonable conclusion as to the proper verdict. It should not be granted if there is a conflict in the evidence, and credibility of evidence is not to be considered in passing on a motion for judgment. *Greer v. United States*, 408 F.2d 631 (6th Cir. 1969); Moore's Federal Practice, Par. 50.-07(2) (Second Edition).

Thus, if there is sufficient evidence to raise a question of fact for the jury, JNOV is improper. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. In deciding the motion, the trial court must view the evidence in a light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in its favor. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *Gillham v. Admiral Corp.*, 523 F.2d 102, 109 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976). When reviewing the trial court's decision, an appellate court is bound by the same standard. *See O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975).

█ If we reverse the trial court's grant of a judgment notwithstanding the verdict, we must then consider the grant of a new trial. A motion for a new trial is addressed to the sound discretion of the trial judge and when the judge has set the jury's verdict aside as against the clear weight of the evidence, that action will not be disturbed unless the court has abused its discretion. *Fortenberry v. New York Life Ins. Co.*, 459 F.2d 114, 116 (6th Cir.), *cert. denied*, 409 U.S. 981, 93 S.Ct. 316, 34 L.Ed.2d 245 (1972).

Applying the standards outlined above, we hold that the district court erred in granting JNOV for the defendant, but did not abuse its discretion in the award of a new trial. Our review of the extensive record compiled below convinces us that the evidence adduced at trial, viewed in a light most favorable to National Polymer, created numerous factual issues appropriate for the jury's resolution. Our review of the record, however, fails to persuade us that the trial court abused its discretion in setting aside the jury's verdict and granting a new trial.

█ The first issue focused on in the interrogatories submitted to the jury concerned representations made by Borg-Warner regarding Cycopac's compliance with the FDA's food packaging requirements. The jury found that Borg-Warner had represented that Cycopac had received FDA approval, that this representation formed a basis of the bargain between the parties, and that Polymer had suffered $7,500.00 in damages from this, primarily in the retooling expenses incurred in switching to PVC and then back to Cycopac during the hiatus in Cycopac bottle production necessitated by the FDA. The trial judge concurred with the jury's finding that Borg-Warner had represented Cycopac to be a polymer with FDA approval. It was his judgment, however, that it was against the clear weight of the evidence for the jury to find such representations to be a basis of the bargain. On this point we believe the trial judge was manifestly correct, that there was not reasonable reliance, nor could there have been reasonable reliance, by National Polymer on the representations which induced entry into the Cycopac program.

In its technical data sheet supplied to Polymer, Borg-Warner stated: "Cycopac polymers are formulated and manufactured specifically for the food packaging market. These food grade materials comply with the U.S. Food, Drug and Cosmetic Act...." This stance was later affirmed by Borg-Warner officials in the meeting with Humko officials and in a letter to Humko on March 20, 1974. The March letter assured Humko that Borg-Warner had conducted FDA guideline extraction tests and found that Cycopac could qualify in one or more categories acceptable to the FDA for food packaging materials. Yet it is clear that

neither Humko nor Polymer relied on these representations as a basis for choosing Cycopac as a bottling material.

Humko knew, from the telephone exchange with Billy Goodrich, that Goodrich as well as an FDA official believed that prior sanction status was not available for Cycopac bottles. It was clear that the FDA had never expressly passed on Cycopac's suitability for food packaging. Humko was well aware of the potential FDA hazards of proceeding with Cycopac, but nevertheless chose that very course. That decision is better understood when the circumstances surrounding it are considered. Humko was in urgent need of a substitute for PVC and its parent corporation, Kraftco, had ruled out all other plastic materials. Rodenbaugh's comments to Borg-Warner personnel reflected this dilemma. He knew that Humko's only alternative to Cycopac was glass, which was cost-prohibitive in terms of both time and money. By Polymer's own admission, it was Humko's change in specifications from PVC to Cycopac, not Borg-Warner's representations regarding Cycopac's FDA status, that dictated Polymer's decision to undertake the production of Cycopac bottles. Since there is an absence of evidence in the record to indicate that Borg-Warner's representations were, in effect, the *sine qua non* for Polymer's entry into Cycopac, the trial court was correct in setting the jury's verdict aside as to this issue.

■ A more substantial dispute developed at trial regarding Borg-Warner's representations and recommendations as to the adequacy of Polymer's equipment for drying Cycopac. The jury concluded that Borg-Warner had represented that Polymer's drying equipment was adequate, that this formed a basis for the bargain, and that the undiscovered inadequacy proximately caused damage to Polymer in the amount of $977,500.00. The trial judge set these findings aside, holding that the clear weight of the evidence showed there were no initial misrepresentations as to the adequacy of the dryers; that if there were any inadequacies, they should have been discov-

ered by Polymer; and that the inadequacies, if any, did not cause the volume of damages awarded by the jury.

The Borg-Warner technical literature supplied to Polymer stated in pertinent part:

In some cases the Cycopac polymers can be processed directly as supplied. However, in a humid environment, drying is required. Four to six hours at 180° F (82° C) in a circulating hot air, desiccant type dryer is normally a sufficient drying time. Longer times at a lower temperature of 150° F (65° C), using a desiccant type dryer, would also be suitable. *Drying at higher temperatures or for prolonger periods should be avoided.*

(emphasis in original). Although Polymer's plant was equipped with dryers Rodenbaugh was concerned about whether they were satisfactory for drying Cycopac. Rodenbaugh testified that at his first meeting with Borg-Warner personnel, he described the Polymer drying equipment and received a favorable reaction. He further testified that this endorsement of the adequacy of Polymer's dryers was repeated when Borg-Warner people surveyed Polymer's plant during their visit on March 21, 1974. The Borg-Warner visitors, however, testified that they never carefully scrutinized Polymer's dryers, but there was no outright denial of the positive evaluations allegedly given to Rodenbaugh.

After Polymer commenced production of Cycopac bottles, Borg-Warner personnel were consulted in an attempt to solve a multitude of problems, one being whether Polymer had sufficient drying facilities. Polymer was having trouble getting the Cycopac to dry properly in the preliminary production, as reflected by Rodenbaugh's phone call to Mr. St. Jean at Borg-Warner on May 20, 1974. Borg-Warner contends that Polymer's drying problems should have made them aware that their drying equipment was inadequate. We find no support for that assertion in the record. Rodenbaugh's complaint to St. Jean was directed at a moisture problem generally; it did not isolate the source of the problem. Indeed,

Polymer argues that it was unable to discover the source of the problem until after discovery in the case began. Then it found that the true source of its problem was excessive moisture content in the raw Cycopac manufactured by Borg-Warner. There was additional evidence from which the jury could find that Borg-Warner represented, during the initial phases of Cycopac production, that Polymer's drying equipment was adequate. In a July 24, 1974 letter, a member of Borg-Warner's packaging resins division, John Shakleford, stated that Cycopac drying was required "in the type dryers you now possess."

Although there was evidence to support Polymer's charge of misrepresentation, Borg-Warner also produced evidence to reinforce its position that over the course of time Polymer was informed that its drying equipment was inadequate. In response to a complaint from Polymer that it was experiencing severe drying problems, Borg-Warner personnel again visited the Memphis plant on July 9–10, 1974. Len Corazzi, a Borg-Warner development specialist, testified that he informed Polymer at that time it was necessary to increase its drying capacity, but the problem persisted. Another visit followed in which Corazzi discovered that Polymer had not increased its drying capacity to the extent that Rodenbaugh had allegedly stated. In his internal memo of August 30, 1974, Corazzi concluded that Polymer still lacked adequate drying capacity to process Cycopac successfully.

Having followed Borg-Warner's advice by increasing his drying equipment's capacity, and having been unable to solve the moisture problem, Rodenbaugh persisted in attempting to solve the problem. He voiced his complaint in a meeting on September 10, 1974 between representatives of Polymer, Humko, Sewell and Borg-Warner. Art Macey of Sewell contested Rodenbaugh's complaint, stating that Sewell was having no problems drying Cycopac. In order to demonstrate this, Macey offered to allow Cycopac that had been dried at the Sewell plant to be run through Polymer's machines. Rodenbaugh accepted this offer. Before the Sewell-dried material was run, the bottles from Polymer's material were appearing with small, visible bubbles. When the 100 pound Sewell sample was run the bubble problem cleared up immediately. Subsequent test data revealed that the pellets from Sewell had approximately 0.2% less moisture than the Polymer pellets. At trial, Rodenbaugh conceded that Polymer was unable to produce bubble-free bottles at the rate achieved by the Sewell-dried material. Indeed, not until the end of September did Polymer possess sufficient drying equipment to dry the resin for five hours; Polymer was unable to obtain the desired production rate until it started with a new drying set-up on June 2, 1975.

Polymer contended that its drying equipment was adequate all along and that it followed the recommendations of Borg-Warner to no avail. The changes in drying equipment proved unsatisfactory as a solution, Polymer submitted and the jury agreed, because Borg-Warner misrepresented the moisture content at which the Cycopac was being shipped and at which it could be processed. At the beginning of the program no statistics on moisture concentration were discussed by the parties. In a letter dated September 5, 1974, however, Borg-Warner informed Rodenbaugh that it shipped Cycopac pellets at the lowest moisture level possible and that recent shipments had been 0.2 to 0.25%. Polymer also argued that Borg-Warner claimed that bubble-free bottles could be produced with a moisture content as high as 0.4%. Understandably, minimal drying would be required if these figures were accurate. The jury could reasonably have found, as it did, that they were not.

Through discovery Polymer found that Borg-Warner had established an internal goal for moisture of 0.3% in April, 1974. Production of Cycopac failed to meet that goal. Borg-Warner's employee, Dr. Watson, testified that his review of Borg-Warner's quality control data revealed that the Cycopac shipped by Borg-Warner contained an average moisture content of 0.42% and some was shipped with a moisture content as high as 0.7%. Polymer further argues

that it had no way of discovering that Borg-Warner was misrepresenting the moisture content and without a method for detecting excessive moisture, Polymer had no means, prior to discovery, of knowing that moisture-laden Cycopac was being received.

Borg-Warner apparently based its drying recommendation (4–6 hours at 180°C) on an initial moisture content between 0.4% and 0.7%. This was borne out by letters written by Borg-Warner to drying equipment manufacturers stating that Cycopac with an initial moisture content as high as 0.7% would have to be reduced to 0.3% for blow-molding. This was inconsistent with Borg-Warner's internal goal for moisture content, and also at odds with the figures quoted Polymer for the moisture content of the shipments it would receive. In fact, Borg-Warner was advised on August 30, 1974 by its own development specialist, Corazzi, that it would have to review and revise its statement that Cycopac could be blow molded at 0.3% moisture. Corazzi testified, significantly, that the 0.3% figure should not be treated "as gospel," but that Polymer nevertheless insisted on treating it as such.

On the moisture issue then, several factual disputes were developed that were suitable for jury resolution. Yet the trial judge did not abuse his discretion in setting these parts of the jury's verdict aside for the evidence was not sufficient for the jury to embrace Polymer's arguments in their entirety. For one, the absence of any representation about Cycopac's shipping moisture content until July, 1974, well after production had commenced, precluded any finding that such representations were a basis of the bargain. Moreover, the failure of the increased drying capacity to rectify the moisture problems should certainly have put Polymer on notice, at some point in time, that moisture in the raw Cycopac was to blame. Polymer was well aware that Cycopac, a new product, attracted moisture from the atmosphere and that drying it was an important aspect of successful processing.

Polymer's allegations of misrepresentations did not pertain only to moisture content but extended to Cycopac's impact strength and its color and clarity. Impact strength is the trade terminology for resistance to breakage. Borg-Warner's technical report represented Cycopac resins as possessing "high impact materials able to withstand drops from normal grocery and kitchen shelf levels." Polymer's experience was to the contrary. The first breakage problems were detected during the test run. Borg-Warner's officials assured Rodenbaugh that this difficulty would be remedied when Polymer learned how to process the material. Despite sundry adjustments the breakage problem persisted and it was not Polymer's alone. Humko's Group Leader in Quality Assurance, Thomas McCormack, stated in his deposition that the bottles which Humko received from all its suppliers had impact deficiencies. The problem persisted at least through October 10, 1974 at which time Humko revised its Cycopac standards downward to accommodate the problem.

Polymer also presented evidence to support its claim by having Richard Bishop, an expert in plastics and polymer chemistry, analyze Borg-Warner's quality control data. Bishop concluded that the viscosity testing conducted by Borg-Warner—an unimportant test for impact strength—did not render the Cycopac fit for marketing. Bishop testified that much of the material shipped to Polymer was not in compliance with Borg-Warner's own specifications, and that in some instances specifications for viscosity were never established, precluding any meaningful testing. In sum, Bishop maintained that Borg-Warner's manufacturing process for Cycopac was "out of control," meaning that the material did not fall within specified limits. Whereas Bishop contended that industry standards would require 95% of any material produced to fall within a predetermined range, he would give Borg-Warner only a "20% confidence level." Particularly significant to Polymer's case was Borg-Warner's failure to produce any evidence that it ever tested

and rejected material for failure to satisfy viscosity standards. Polymer also showed that it had attempted to follow Borg-Warner's advice on the problem by refurbishing some bottle molds and purchasing equipment to regulate the mold temperature without measurable improvements.

Borg-Warner countered this with sufficient evidence to render the jury's wholesale acceptance of Polymer's case suspect enough to allow the trial judge to disturb the verdict. It first argued that whatever the impact strength of Cycopac, Polymer was aware of the impact strength very early on and it nevertheless chose to continue production. It also introduced hard evidence to show that Polymer's breakage problems were caused, at least in part, by defective molds. All the witnesses who testified on the subject, including Rodenbaugh and Bishop, agreed that a defective mold would create a defective bottle. Borg-Warner then introduced testimony based on visits by its employees to Polymer's Memphis plant. They had observed that different molds on the same machine using the same material produced bottles with radically different mean failure heights, leading inevitably to the conclusion that a mold was at fault. This problem was first noted during the July 9–10, 1974 visit and had not been corrected as of the September 10, 1974 excursion.

As with its expectations for impact strength, Polymer argued to the jury that it based its expectations for color and clarity on Borg-Warner's technical literature on Cycopac packaging resins which stated that Cycopac had an "unusual balance of properties," including "glass-like gloss and clarity." The color and clarity of the bottles was important to Humko, which needed an attractive package for its oils. PVC bottles had satisfied that need, but the Cycopac bottles Humko received ranged in color from amber to pale yellow. McCormack stated that Humko found the inconsistent color of the bottles to be a continuous problem common to all its suppliers, not just Polymer. Eventually Humko was forced to waive its color specifications in order to obtain an ample supply of bottles, changing from clear to straw-colored bottles.

Borg-Warner argued that Rodenbaugh was aware of the yellow-colored bottles Cycopac produced as early as their first meeting on March 21, 1974. While that may be true, it does not explain why the color was inconsistent in contrast to the representations made by Borg-Warner's literature. Unlike the bottles produced from Borg-Warner's Cycopac, this issue was certainly clear enough to permit the jury to reach the conclusion it did.

Another issue which produced conflicting evidence concerning the ability of Polymer's competitors to manufacture Cycopac successfully. Bishop admitted that Polymer had received Cycopac equal in quality to the other companies, but it rejected a much higher percentage. Sewell returned 4% of its Cycopac, Imco only 1% and Delkay none, while Polymer returned 13.6% of its Cycopac. While there was evidence to support the trial judge's conclusion that two other companies produced Cycopac bottles successfully, the record also contains ample documentation for Polymer's position that the problems were common to all suppliers. Polymer's chief competitor was Sewell. A Borg-Warner internal memo revealed that as of September 9, 1974, Sewell, along with Polymer and Humko, was still waiting for Borg-Warner to solve the impact problem. Another memo on October 17, 1974 contained recognition of Sewell's complaint about red pellet contamination. The same complaint was noted in a subsequent memo on October 28, 1974, and again on November 10, 1974. Similar reports persisted until April 22, 1975. Sewell's production report for June 2–8, 1975 reflected that Cycopac efficiency ran at 68% and would have been much better but for a serious bubble problem which Sewell attributed to excessive moisture in the virgin compound shipped by Borg-Warner.

Imco's experience with Cycopac was less extensive and more satisfactory. Overall its experience was described as "very good," but it too had problems. After Imco started making Cycopac bottles in December,

1974, it received Cycopac contaminated with red pellets. At one point its bottles suffered substantial breakage, although this was not traced back to the material. On another occasion, breakage occurred due to deterioration of parting lines on its molds. Color variation proved to be a problem for some time, although no bottles were rejected by Humko for this reason. Despite drying the Cycopac per Borg-Warner's recommendation, Imco had moisture problems with the bottles. This problem appeared to stem from Imco's use of one dryer for two machines, as the problem disappeared when it returned to one dryer for each machine.

In sum, the evidence was profuse, in some respects fragmentary, and conflicting on important issues. In light of the jury's clear authority to sift and weigh the evidence presented to it in determining what probably transpired in Polymer's experience with Cycopac, it could have reached a number of different conclusions. One conclusion it could not reach from this record was a wholesale acceptance of all of Polymer's theories of liability. On this record certain of the jury's conclusions were against the clear evidentiary weight. Accordingly, because the trial court's order correctly recognized this it was not entered in an abuse of discretion.

## IV.

As there will be a new trial we must determine whether the district court was correct in refusing to submit to the jury Polymer's damages theories relating to punitive damages and loss of the value of the business.

At the close of its proof, Polymer was permitted to introduce evidence on Borg-Warner's net sales and net earnings in furtherance of its claim for punitive damages. *See Breault v. Friedli*, 610 S.W.2d 134, 138 (Ct.App.Tenn.1980). At the close of all the evidence, however, the trial judge concluded that this was "not a case that should be submitted for punitive damages." Relying on cases involving fraudulent misconduct and a failure to warn and remedy known dangers, where punitive damages were con-

sidered appropriate, Polymer submits that the district court erred in not allowing the jury to consider punitive damages.

The general standard for punitive damages under the Tennessee law that controls this diversity case was outlined in *Johnson v. Husky Industries, Inc.*, 536 F.2d 645 (6th Cir. 1976):

> Under Tennessee law punitive damages may only be awarded in cases involving fraud, malice, gross negligence or oppression, where a wrongful act is done with a bad motive or so recklessly as to imply a disregard for social obligations, or where there is such willful misconduct or entire want of care as to raise a presumption of conscious indifference to consequences. Such damages are allowed as punishment of the wrongdoer and are not based so much upon the nature and extent of the injury as they are upon the oppression of the party who does the injury.

536 F.2d at 650 (citations omitted). *See also Edwards v. Travelers Insurance of Hartford, Conn.*, 563 F.2d 105, 119 (6th Cir. 1977). Considering this standard, the issue is whether the evidence was sufficient to submit the issue of punitive damages for resolution by the trier of fact. *See Drayton v. Jiffee Chemical Corp.*, 591 F.2d 352, 366 n.13 (6th Cir. 1978); *Guilbert v. Phillips Petroleum Corp.*, 503 F.2d 587, 591 (6th Cir. 1974).

Our review of the record convinces us that the trial court's decision not to instruct the jury on the issue of punitive damages was proper because Borg-Warner's conduct does not rise to the level of maliciousness which Tennessee law requires. Rather, it reflects a manufacturer attempting to cope, many times unsuccessfully, with the vagaries of an experimental product. It will be for a jury to determine whether the Cycopac produced by Borg-Warner for Polymer fell short of Borg-Warner's predictions and representations of success. But throughout the course of dealing with Polymer, we cannot say that Borg-Warner's conduct manifested the type of

"conscious indifference to consequences" which Tennessee law requires.

We also agree that the district court was correct in withholding from the jury the theory of recovery for loss of value of the business. Polymer has not demonstrated that Tennessee law recognizes this theory; the closest analogy would be a claim for loss of goodwill. *See Agricultural Services Ass'n v. Ferry-Morse Seed Co.*, 551 F.2d 1057 (6th Cir. 1977). There we defined goodwill under Tennessee law as "a reasonable expectation of its continued profitable operation." 551 F.2d at 1071. The most problematic aspect of Polymer's attempt to recover on this theory is the doubt as to whether Polymer operated at a profit prior to and during its Cycopac period. The trial court totally discredited the testimony of Polymer's expert witness, Isom, regarding lost profits, finding that "there is nothing in National Polymer's history to support Isom's testimony that it lost profits in 1974–75 due to defective Cycopac, of $445,-000." Moreover, it is clear that Polymer experienced substantial financial difficulty before embarking on the Cycopac program. These difficulties continued and were aggravated by under-capitalization and cash-flow problems as testified to by Robert Armstrong, President of Polymer's parent corporation. These factors compel us to uphold the trial court's decision on this issue.

The decision of the district court entering a judgment notwithstanding the verdict is reversed and the decision granting a new trial is affirmed.