ALYESKA PIPELINE SERVICE COMPANY, Appellant and Cross-Appellee,

v.

Lee O'KELLEY, Appellee and Cross-Appellant.

Nos. 5136, 5137.

Supreme Court of Alaska.

May 28, 1982.

---

Mary A. Nordale, Fairbanks, for appellant and cross-appellee.

William J. Donohue, of Kennelly, Azar & Donohue, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

This appeal and cross-appeal arise from a sales contract action. The case involves issues of contract interpretation, the exclusion of evidence on grounds of lack of relevance, and the propriety of refusing to give an instruction on punitive damages.

In the summer of 1976, Lee O'Kelley learned of the existence of surplus plywood crates in "section four" of the pipeline, the portion of the pipeline extending from near Fairbanks to Prudhoe Bay. The crates had been used to ship pipe insulation material. Each crate was approximately eight feet-eight inches wide by six feet high and twenty-four feet long. When dismantled, each crate produced four long pieces of reusable plywood and two shorter pieces.

Sometime before September 1976, O'Kelley made a rough inventory of the surplus plywood in section four and counted approximately 250 semi-trailer loads of plywood. He then contacted Alyeska's sales department in Anchorage and entered into negotiations for the purchase of the plywood. During these negotiations, Alyeska provided O'Kelley with a "Surplus Disposal Request" which was an Alyeska internal document whereby surplus materials were inventoried and disposal authorized. The inventory listed 8,600 panels of surplus plywood.

On September 7, 1976, O'Kelley sent Alyeska a written offer to buy at eight dollars per crate the plywood "located north of Fairbanks to Prudhoe Bay." The offer further provided: "I will furnish all transportation with this price. It is also understood that Alyeska will load us."

On September 20, 1976, Alyeska and O'Kelley signed a written sales agreement, in which Alyeska sold O'Kelley all "surplussed insulation plywood crates ... in Section 4 of the Pipeline." Alyeska agreed to O'Kelley's price of eight dollars per crate "loaded on your conveyance." In addition, the agreement required payment before removal, with an initial payment of $8,000 and required that the "materials must be removed by continuing until removed."

On October 1, 1976, O'Kelley paid $4,000 under the sales agreement and began removing the plywood. Later he made another $4,000 payment. O'Kelley testified that in December 1976, he began having difficulty getting Alyeska to load his trucks as per the agreement. O'Kelley further testified that despite numerous complaints to Alyeska, he had to load the trucks himself, either

by hand or by the use of his own forklift. If Alyeska had loaded his trucks, O'Kelley testified that he could have removed the remaining plywood within approximately two months.

O'Kelley made repeated efforts to remove the plywood during the spring and summer of 1978. After refusing O'Kelley's tender of another $2,000 in July, and denying O'Kelley's request in July to allow him to inventory the remaining plywood, on August 11, 1978, Alyeska sent him a letter rescinding the sales agreement and offering a refund of any of O'Kelley's payments in excess of the amount of plywood already removed. The termination letter claimed that O'Kelley had breached the agreement by failing to remove the crates on a "continuing" basis. Alyeska then burned the remaining plywood in section four.

O'Kelley filed the present action seeking recovery from Alyeska for breach of the sales contract and conversion of the plywood. In his complaint, O'Kelley sought both compensatory and punitive damages.

The case was tried before a jury and a special verdict was returned in favor of O'Kelley. In its verdict, the jury found for O'Kelley on both the breach of contract and conversion theories, awarding him compensatory damages of $274,530.08 under the contract theory and, in the alternative, $229,852.20 under the tort conversion theory. The court refused to give a punitive damages instruction and no punitive damages were awarded.

This appeal follows the trial court's entry of final judgment on the contract claim in accordance with the jury's contract verdict of $274,530.08 plus prejudgment interest, costs, and attorney's fees for a total final judgment of $336,608.68. O'Kelley cross-appeals, contending that the trial court erred in refusing to give a punitive damages instruction.

## I.

The first issue we address is whether the trial court erred in denying admission of Alyeska's "Surplus Disposal Request" ("SDR") on certain plywood crates. In its

offer of proof on the SDR, Alyeska contended that it was an internal company document whereby surplus materials were inventoried and their disposal authorized. O'Kelley admitted that he had been presented with a copy of the SDR before he made his offer to Alyeska to purchase the plywood. No further evidence was offered or presented on this document.

Alyeska contends that the SDR was relevant for three different purposes. First, relying on the term "surplussed crates" contained in the sales agreement and on O'Kelley's admission that he had relied on the SDR prior to making his offer, Alyeska maintained that the SDR was relevant to show that the proper interpretation of "surplussed" limited the contract to the plywood listed on the SDR. In other words, Alyeska contended that the SDR was relevant to the interpretation of the words of the purchase agreement and specifically the meaning of the words "surplussed crates."

Second, Alyeska contended that the term "surplussed" should be independently interpreted to mean plywood transferred from the construction branch to the surplus management branch within Alyeska. Alyeska then maintained that the SDR was a listing of the portion of scrap plywood so transferred to the surplus management branch. Therefore, the SDR was relevant to show the amount of plywood crates transferred since this amount represented the amount of plywood sold under the contract.

Third, after the trial court rejected Alyeska's definition of "surplussed" and instead held that the contract was for all the scrap plywood crates in section four, Alyeska then sought to introduce the SDR as an inventory of the total amount of plywood then existing in section four, both "surplussed" and "unsurplussed."

The trial court ruled that the SDR would not be admitted into evidence unless Alyeska provided an adequate foundation by presenting witnesses who had personal knowledge of the contents of the SDR and who could explain whether it was a partial or a complete inventory of the plywood in

section four. The judge also indicated that he felt the document was at best only a rough estimate and that therefore foundation testimony was required to establish its accuracy. Finally, the court noted that it had earlier improperly denied O'Kelley's discovery requests for Alyeska's shipping documents showing the number of insulation crates shipped into section four. The trial court had issued a "protective order" preventing the discovery of these documents based on Alyeska's contention that they were irrelevant because the contract was only for *"surplussed"* crates, not *all* crates. Later, at trial, the court held that the contract was instead for all crates in section four. Recognizing the relevance of the shipping documents under its final interpretation of the agreement and realizing their necessity for use in impeaching the contents of the SDR, the trial court based its decision to deny admission of the SDR partly on the element of unfairness resulting from its earlier discovery order.

■ We hold that the trial court erred in refusing to admit the SDR into evidence. While we agree that Alyeska did not lay an adequate foundation to use the document as proof of the exact number of crates in section four, we find that the SDR is extrinsic evidence relevant to interpretation of the contract.[1] O'Kelley admitted that he relied upon the SDR in negotiating and then contracting with Alyeska. The document therefore bears on the parties' intent as to the approximate quantity of plywood

meant to be sold. As extrinsic evidence helpful in interpreting a disputed contractual term, the document is relevant and admissible for this limited purpose.[2] *See Tsakres v. Owens*, 561 P.2d 1218, 1223 (Alaska 1977); *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579 (Alaska 1976); *Kupka v. Morey*, 541 P.2d 740 (Alaska 1975).

■ We note further that the SDR is not hearsay when admitted as extrinsic evidence to aid in contract interpretation. As stated by Alaska Rule of Evidence 801(c):

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Admitted solely as evidence of the surrounding circumstances relevant to interpretation of the contract, the SDR is not being used to prove the truth of the matter asserted and hence is not hearsay. We therefore do not address Alyeska's arguments concerning the business records exception to the hearsay rule.

■ Finally, we uphold the trial court's decision to bar use of the SDR as proof of the actual quantity of plywood in section four of the pipeline. At trial, Alyeska offered no testimony tending to establish that the SDR was a complete inventory of the plywood in that section. Nor did Alyeska produce the individual or individuals responsible for creating the challenged docu-

1. In the past, this court has stated or implied that resort to extrinsic evidence can take place only after a preliminary finding of ambiguity. *Tsakres v. Owens*, 561 P.2d 1218, 1221–22 (Alaska 1977); *Hendricks v. Knik Supply, Inc.*, 522 P.2d 543, 546 (Alaska 1974). Thus, a court would review extrinsic evidence to make a preliminary finding of ambiguity and only then consider extrinsic evidence in construing the contract. A minority of this court has repeatedly criticized this two-tiered test as artificial and unduly cumbersome, noting that it offers no advantage over one which initially turns to extrinsic evidence for such light as it may shed on the reasonable expectations of the parties. *Wright v. Vickaryous*, 598 P.2d 490, 497 n.22 (Alaska 1979); *Wessels v. State, Dept. of Highways*, 562 P.2d 1042, 1052 n.39 (Alaska 1977). We think this criticism is sound and hold, as we have intimated before, that a court

in this jurisdiction may initially turn to extrinsic evidence in construing a contract.

2. Generally, the interpretation of a writing is a task for the court. Restatement (Second) of Contracts § 238, Comment d (Tent. Drafts Nos. 1–7, 1973). However, where "interpretation of a written instrument turns on the acceptance of extrinsic evidence, the process of weighing such evidence should be for the trier of fact." *Hausam v. Wodrich*, 574 P.2d 805, 809 (Alaska 1978); *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1194 (Alaska 1975); Restatement (Second) of Contracts § 238, Comment e (Tent. Draft 1–7, 1973) ("[b]ut if the issue depends on evidence outside the writing, and the possible inferences are conflicting, the choice is for the trier of fact").

ment. Absent these foundational facts establishing the document's relevancy, the trial court was well within its discretion in refusing to admit the SDR as proof on the issue of the actual quantity of plywood in section four. *See Palfy v. Rice*, 473 P.2d 606, 612 (Alaska 1970) (trial court correctly excluded document due to insufficient foundation establishing authorship).

In conclusion, we hold that the trial court erred in denying the admission of the SDR on the issue of the interpretation of the contract. That document bears on the parties' intent as to the amount of wood meant to be sold and thus gives content to the disputed quantity term, "surplussed" crates. In light of this conclusion, we remand for a redetermination of the damages issue.

## II

■ The second issue we address is whether the lower court erred in finding the contract to be one for a fixed amount of goods. Alyeska argues that since the contract gives O'Kelley the exclusive right to remove the surplus wood, it is measured by the needs of the buyer and hence must be considered a requirements contract.[3]

■ We find no merit in this contention. Nothing in the record suggests that the parties intended the contract to impose a duty on Alyeska to sell, and a duty on the part of O'Kelley to buy, only the number of crates O'Kelley required. Nor does the contract itself bear the earmarks of a typical requirements contract, as it lacks a stated estimate of the buyer's requirements, a term specifying duration and minimum and maximum projections of the goods involved.[4] We therefore agree with the trial court that the sales agreement here called for the sale of a fixed and definite quantity of goods, specifically all "surplussed" plywood in section four.

■ Having reached this result, it is apparent that the actual amount of wood represented by this phrase presents a jury question. At trial below, O'Kelley testified that he estimated that there were approximately 250 trailer loads of plywood in section four. Qualifying this estimate is O'Kelley's admission that he relied on the SDR in contracting with Alyeska, that document listing only 184 loads of surplussed plywood.[5] And finally, the sales agreement calls for payment of $12,000.00 which at the contract price of $8.00 per crate, amounts to 128.5 trailer loads of wood. On the basis of

3. A requirements contract is generally defined as a contract in which the seller agrees to supply all the specific goods or services which a buyer may require during a certain period in exchange for the promise of the buyer to purchase his required goods or services exclusively from the seller. *See Propane Indus., Inc. v. General Motors Corp.*, 429 F.Supp. 214, 219 (W.D.Mo.1977); *Loizeaux Builder's Supply Co. v. Donald B. Ludwig Co.*, 144 N.J.Super. 556, 366 A.2d 721 (1976).

It is somewhat unclear what Alyeska means when it refers to O'Kelley's requirements. It appears from the record that O'Kelley meant to purchase all "surplussed" crates in section 4, with the ultimate intention of reselling the salvaged plywood. In that O'Kelley was not operating a business with specific needs in the way of goods or services, it makes little sense to talk of his requirements.

4. *See Shader Contractors, Inc. v. United States*, 276 F.2d 1, 4, 149 Ct.Cl. 535 (1960) (maximum and minimum estimates and statement of duration); *Marx v. American Malting Co.*, 169 F. 582, 583 (6th Cir. 1909) (maximum and minimum estimates of the buyers requirements); *Homestake Mining Co. v. Washington Pub.*

*Power Supply*, 476 F.Supp. 1162 (N.D.Cal.1979) (minimum and maximum terms, statement of purpose and reference to requirements usually indicates the presence of a requirements contract). *See generally* Note, *Requirements Contracts: Problems of Drafting and Construction*, 78 Harv.L.Rev. 1212 (1965).

5. The SDR indicated that there were 8,600 panels in section four, 2,476 of those from unopened crates. 8,600 long panels represents 2,150 crates, or 2,150 bottom panels, 2,150 top panels, 4,300 sides and 4,300 ends. Based on O'Kelley's testimony, these panels constituted 184 truck loads of wood.

We reiterate that the SDR is inadmissible to show the actual number of panels in section four. However, as noted above, the document is admissible on the issue of the parties intent in regard to the quantity of plywood meant to be sold. In that O'Kelley admitted to reading the SDR, that document serves to impeach his testimony that he believed that there were approximately 250 trailer loads of plywood in section four.

these differing approximations, the jury on remand can decide how much plywood was in section four and fix O'Kelley's damages accordingly.

### III.

Alyeska's final contention is that the trial court permitted O'Kelley to introduce irrelevant and inflammatory evidence. One of O'Kelley's witnesses testified that Alyeska refused to aid a sick baby. Alyeska argues that this evidence appreciably influenced the jury by clothing Alyeska with the character of "baby killers."

Although we agree that the evidence was irrelevant, we hold that its admission constituted harmless error. Alyeska has the burden of proving both error and prejudice. *Poulin v. Zartman*, 542 P.2d 251, 261 (Alaska 1975), *on rehearing*, 548 P.2d 1299 (1976); *Zerbinos v. Lewis*, 394 P.2d 886, 889–90 (Alaska 1964); Alaska R.Civ.P. 61.[6] As we stated in *Love v. State*, 457 P.2d 622, 631 n.15 (Alaska 1969): " '[T]he members of this court must necessarily put themselves, as nearly as possible, in the position of the jury in order to determine whether, as reasonable men, the error committed probably affected their verdict.' " (quoting *State v. Dutton*, 318 P.2d 667, 671

(Ariz.1957)). Among the factors to be considered in determining whether error was harmless is the degree of emphasis placed upon the evidence during the trial, both during questioning and in the closing arguments. *Poulin v. Zartman*, 542 P.2d at 261.

The trial in this case required six days of testimony. The reference to the incident with the baby was brief and inconsequential, mentioned only in response to two questions. The incident was not referred to in counsels' closing arguments to the jury. In light of these factors we can say that the error "was not such as to have 'appreciably affected the verdict.' " *Brown v. State*, 601 P.2d 221, 227 (Alaska 1979) (quoting *Love v. State*, 457 P.2d 622, 632 (Alaska 1969)).

### IV.

In his cross-appeal, O'Kelley contends that the trial court erred in refusing to give a punitive damages instruction.[7] O'Kelley reasons that Alyeska committed an intentional tort by burning the plywood and that the punitive damages issue therefore should have been submitted to the jury.[8] We disagree; the evidence did not support the requested instruction.

The mere fact that Alyeska may have committed an intentional tort did not,

---

**6.** Alaska R.Civ.P. 61 provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

**7.** In reviewing the requested instructions, the trial court ruled that reasonable minds could only agree that O'Kelley was not entitled to punitive damages and granted a directed verdict in Alyeska's favor on this issue. In reviewing this action, it is not our task to reweigh the evidence or judge the credibility of the witnesses, but rather to determine whether "the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ in their judgment." *City of Whittier v. Whittier Fuel &*

*Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)).

**8.** O'Kelley also contends that Alyeska breached the agreement by failing to load O'Kelley's trucks and that this breach entitled O'Kelley to punitive damages. In *Lull v. Wick Constr. Co.*, 614 P.2d 321 (Alaska 1980), we noted that, although most courts do not permit punitive damages in breach of contract cases, some courts award such damages where the breach is malicious or grossly reckless. *Id.* at 325. In *Lull*, we neither adopted nor rejected the minority position for we found that the wrongdoer's conduct could not be fairly characterized as malicious or grossly reckless. *Id.* Similarly, we need not address the issue here for we find that Alyeska's failure to load the trucks falls far short of the type of breach potentially entitling the aggrieved party to punitive damages. Indeed, O'Kelley admits that, with one exception, Alyeska was "cooperative" and tried to do everything possible to help load the trucks.

standing alone, obligate the trial court to give a punitive damages instruction.[9] By their very nature, such damages turn on the wrongdoer's motive, state of mind, and degree of culpability, rather than the particular tort committed. K. Redden, Punitive Damages § 4.2 (1980). In *Bridges v. Alaska Housing Authority*, 375 P.2d 696 (Alaska 1962), we noted that punitive or "exemplary damages are those awarded in excess of actual loss where the wrongdoer's conduct can be characterized as outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another." *Id.* at 702. Malice need not be express, but may be inferred from acts evidencing a callous disregard for the rights of others. *Sturm, Ruger & Co., Inc. v. Day*, 594 P.2d 38, 46 (Alaska 1979).

Whether malice is present is a question of fact, *Haskins v. Shelden*, 558 P.2d 487, 494 (Alaska 1976), and the trier of fact is given broad discretion to grant or withhold punitive damages. *Id.; Schafer v. Schnabel*, 494 P.2d 802, 805 (Alaska 1972). But where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial court need not submit the punitive damages issue to the jury. *National Polymer Products v. Borg-Warner Corp.*, 660 F.2d 171, 183 (6th Cir. 1981); *Guilbert v. Phillips Petroleum Co.*, 503 F.2d 587, 591 (6th Cir. 1974); *Consolidated Sales Co. v. Malone*, 530 S.W.2d 680, 682–83 (Ky.1975); *Mangrum v. Ford Motor Credit Co.*, 577 P.2d 1304, 1307 (Okl.1978); *Sopkin v. Premier Pontiac, Inc.*, 539 P.2d 1393, 1397 (Okl.App. 1975). Indeed, submitting the issue to the jury in such a situation may constitute reversible error. *Mangrum v. Ford Motor Credit Co.*, 577 P.2d 1304, 1307 (Okl.1978) (error for punitive damages issue to go to jury in conversion case where no evidence of ill will or evil intent to injure plaintiff).

Our review of the evidence convinces us that the trial court properly kept the punitive damages issue from the trier of fact. The evidence establishes that: (1) Alyeska had reason to believe that O'Kelley had breached the contract by failing to remove the plywood expeditiously and that the agreement was no longer binding; (2) that Alyeska gave O'Kelley notice of its intention to burn the plywood and offered to reimburse him for any wood paid for but not removed; (3) that Alyeska burned the wood because it needed to clear the site for reseeding; and (4) that Alyeska did not profit from its action. Given the complete absence of "outrageous acts" or aggravating circumstances justifying the imposition of punitive damages, we hold that the trial court did not err in refusing to instruct the jury on punitive damages. *See National Polymer Products v. Borg-Warner Corp.*, 660 F.2d 171, 183 (6th Cir. 1981).

REMANDED for a redetermination on damages.

---

**9.** We do not mean to suggest by this discussion that O'Kelley had an action in trover for the conversion of all the wood. The trial court ruled that title to the wood did not pass until the scrap was loaded on O'Kelley's trucks and that O'Kelley did not have an immediate right to possession to any wood not paid for. There is therefore some question as to whether O'Kelley had a sufficient property or possessory interest in the wood not yet paid for to maintain an action for conversion. However, given that the trial court entered judgment on the contract theory and our disposition of the punitive damages issue, we need not address this issue.