James D. BACHTEL and Donna Bachtel, Plaintiffs-Appellees,

v.

MAMMOTH BULK CARRIERS, LTD., Defendant-Appellant.

Twin Harbor Stevedoring Co., Intervenor.

James D. BACHTEL and Donna Bachtel, Plaintiffs-Appellants,

v.

MAMMOTH BULK CARRIERS, LTD., Defendant.

Twin Harbor Stevedoring Co., Intervenor-Appellee.

Nos. 77–3645, 77–3043.

United States Court of Appeals, Ninth Circuit.

Aug. 20, 1979.

As Amended on Denial of Rehearing Oct. 15, 1979.

Robert D. Duggan, Levinson, Friedman, Vhugen, Duggan, Bland & Horowitz, Seattle, Wash., for plaintiffs-appellees.

John P. Sullivan and M. Bayard Crutcher, Bogle & Gates, Seattle, Wash., for defendant-appellant.

Paul C. Gibbs, Williams, Lanza, Kastner & Gibbs, Seattle, Wash., for intervenor-appellee.

Before KILKENNY and SNEED, Circuit Judges, and WATERS, District Judge.*

KILKENNY, Circuit Judge:

Mammoth Bulk Carriers [Mammoth] appeals from a judgment entered in an action prosecuted by appellee James D. Bachtel and his wife for personal injuries sustained by him when he fell to the dock from a logload on the deck of the M/S MAMMOTH FIR, a vessel owned by Mammoth. Bachtel was employed as a longshoreman by Twin Harbor Stevedoring Co., a stevedore engaged in loading logs on board the vessel. After a trial by jury, a judgment was entered in favor of the Bachtels. Before verdict, the stevedore company intervened pursuant to 33 U.S.C. § 933 and asserted a lien against the recovery in the amount of the

---

* The Honorable Laughlin E. Waters, United States District Judge for the Central District of California, sitting by designation.

worker compensation benefits it had paid. The Bachtels moved for a pro-rata contribution of attorney fees from the intervenor. The district court denied the motion. The Bachtels appeal from this denial. The parties stipulated that the two appeals should be consolidated for all permissible purposes under FRAP 3(b).

## OUTLINE OF FACTS

The MAMMOTH FIR, a bulk log carrier in the Pacific trade, is similar to many other log carriers in design and construction. It has five hatches, all forward of the house. It was manned by a Korean crew. The accident occurred in Aberdeen, Washington, a major log exporting port. Ninety percent of the stevedoring work in that area is the loading of log ships. The MAMMOTH FIR was moored in a berth and at the time of the accident was fully loaded. The lashing of the deck cargo of logs was the only work remaining to be done by the stevedore.

The deck load of logs was contained within steel stanchions along both sides of the vessel. The stanchions rose 20 feet from the deck and the logs rose to within a foot or two from the top of the stanchions. The load was "trimmed" to reach a height approaching 30 feet at the centerline of the ship. The deck load was to be secured with wire [cable] ropes, assisted by heavy chains. Each wire rope and chain was shackled at the lower end to a pad eye on the deck. The ropes were laid over the top of the logs from both sides of the ship, about six feet apart, and tightened by "lacing" them together at the peak or top of the load. The chains were then lifted by a winch from both sides of the ship and strung to the peak of the load to be straightened and freed by longshoremen of any twists, each chain to be secured to its opposing chain by a turn buckle. The work of straightening the chain is commonly known as "pulling."

The accident occurred while Bachtel, in his employment as a longshoreman, was helping another longshoreman pull a chain atop the starboard side of the deck load at the number two hatch.[1] While Bachtel and his co-worker were taking the twists out of the chains, Bachtel fell some 30 feet to the dock below. There is some confusion as to the manner in which he actually fell, but there is no question that he was on the top starboard side of the deck load of logs when he started his fall and he was seriously injured.

## PROCEDURAL BACKGROUND

Briefly stated, the Bachtels charged Mammoth with negligence in the following particulars:

(1) Failing to provide a means of erecting a safety line or safety net at the edge of the loaded deck when it knew or in the exercise of reasonable care should have known that longshoremen would be required to work at or near the edge of the deck load and thereby be exposed to a high risk of falling.

(2) Permitting the loading of logs on its deck above the level of the stanchions when it knew or in the exercise of reasonable care should have known that safety lines or safety nets would not be rigged to minimize the risk of longshoremen personnel falling to the dock below.

(3) Directing the design of the logload on its deck at levels which created an unreasonable risk of harm to longshore personnel without providing the means for erecting safety lines or nets or other equipment to minimize such risk.

(4) Failing to require the stevedore to take precautions to prevent the risk of falling when Mammoth knew that the contracted work created a risk of harm by falling, this contention being based on the land based standard of care imposed on contractors under Restatement of Torts (Second).

(5) Violating OSHA's Safety and Health Regulations for longshoring, 29 C.F.R. § 1918.32(b).

At the close of the Bachtels' case, Mammoth moved for a directed verdict. This motion was denied and Mammoth went forward with its case. At the close of the

---

1. See Appendix A.

evidence and before submission to the jury, Mammoth failed to again move for a directed verdict. It did, however, propose a jury instruction to direct a verdict in Mammoth's favor, which was refused by the district court. After instructions and arguments, the jury returned a verdict in favor of Bachtel for damages in the sum of $305,-109.00 and in favor of his wife for loss of consortium in the sum of $50,000.00. In arriving at its verdict, the jury found that Bachtel was guilty of negligence to the extent of 25% and accordingly reduced the recoveries to $266,331.75. Mammoth then moved for a judgment notwithstanding the verdict pursuant to Rule 50(b), FRCivP. Mammoth's assignments of error are grounded upon the denial of this motion.

## ISSUES

I. Did the court err in denying appellant's motion for judgment notwithstanding the verdict?

II. Was Mammoth guilty of "negligence" as that word is used in 33 U.S.C. § 905(b)?

III. Was one of the court's instructions erroneous as a matter of law?

IV. Did the court err in denying the Bachtels' motion to allocate attorney fees between themselves and the stevedore?

## APPLICABLE STATUTORY LAW

In reviewing the issues before us, we must look to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* [the Act]. Bachtel brought his action under the 1972 amendments to the Act; in particular, 33 U.S.C. § 905(b). These amendments radically changed the law in this field. By virtue of these amendments, the longshoreman is entitled to increased workers' compensation benefits, but these benefits now constitute his sole reme-dy against the stevedore. However, the longshoreman has a cause of action against the vessel owner on a negligence theory, the former "unseaworthiness" brand of strict liability being abolished by the Act. Additionally, the shipowner, if liable, has no cause of action for indemnity against the stevedore.

■ If, under the provisions of the Act, the injured longshoreman fails to bring an action against the shipowner within six months, the stevedore or its compensation carrier, has the right to do so on his behalf. If the stevedore brings the action, the statute provides for the manner in which the recovery is to be distributed. 33 U.S.C. § 933(e). The statute is silent as to distribution of proceeds when the longshoreman brings the suit, but it is clear that the stevedore has a lien against the longshoreman's recovery for the amount of benefits it has paid. The statute also does not define negligence. However, Congress clearly did not intend to use the word in its common law sense. We shall touch upon this subject later in the opinion.

## I.

■ In the light of our conclusion that the evidence of Mammoth's negligence is substantial, if not overwhelming, we find no reason to examine in detail the merits of Mammoth's contention that the court erred in failing to grant its motion for judgment notwithstanding the verdict. As to the Bachtels' contention that the procedural provisions of FRCivP 50(b)[2] preclude our consideration of this issue, no doubt the district court considered Mammoth's motion for a directed verdict at the close of the plaintiff's case and in addition its request for an instruction requiring the jury to return a verdict in Mammoth's favor. These procedural steps placed the issue of the sufficien-

---

**2.** "(b) *Motion for Judgment Notwithstanding the Verdict.*

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; . . . ."

cy of the evidence directly before the court. Consequently, the court had jurisdiction to pass on the sufficiency of the evidence under the Rule 50(b) motion even though there was no motion for a directed verdict as required by the rule.

Although *Guerrero v. American-Hawaiian Steamship Co.*, 222 F.2d 238, 244 (CA9 1935), uses strong language in support of a strict enforcement of Rule 50(b), what is there said must be viewed in the light of the fact that a summary judgment was involved and the judge, rather than a jury, decided the case.

Our view, as above expressed, is supported by *Oliveras v. American Export Isbrandtsen Lines, Inc.*, 431 F.2d 814, 817 (CA2 1970); *Jack Cole Co. v. Hudson*, 409 F.2d 188, 191 (CA5 1969) [requested instruction for a directed verdict is the equivalent of a motion for a directed verdict]; and 9 Wright & Miller 2539, p. 608. We decline to follow the demagogic approach expressed in *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (CA3 1978), or *Martinez-Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565 (CA1 1978). Accordingly, we hold that the district court properly denied Mammoth's Rule 50(b) motion on the ground that the evidence was sufficient to support the verdict.

## II.

Before the 1972 amendments to the Act, the longshoremen could sue the shipowner for damages for personal injuries resulting from negligence or the unseaworthiness of the vessel. If the unseaworthiness resulted from a breach of the stevedore's implied warranty to perform its services in a safe and workmanlike manner, the shipowner would either implead the stevedore or, after judgment for the longshoreman, prosecute an action for indemnity against the stevedore. This triangular type of law suit resulted usually in the longshoreman receiving indirectly from the employer sums sub-

stantially more than the employer would have to pay the longshoreman by way of benefits under the then existing compensation act. Inasmuch as this circuity of litigation did violence to the statutory scheme then existing, the Congress passed the 1972 amendments. The main purpose of those amendments was to trade a rather substantial increase in compensation benefits to the longshoreman for his right to recover damages from the shipowner for personal injuries resulting from the unseaworthiness of the vessel. The longshoreman, however, retained a right to bring an action against the shipowner [Mammoth] for injuries resulting from the latter's *negligence.*

Due to Congress' failure to define "negligence" as it used that word in 33 U.S.C. § 905(b) (the amendment which permits the longshoreman to recover against the shipowner), the law on the subject in our circuit,[3] and in others, was in a state of flux until the recent decision in *Santos v. Scindia Steam Navigation Co., Ltd.*, 598 F.2d 480 (CA9 1979). *Santos* stated a standard of negligence to be applied in 33 U.S.C. § 905(b) actions, as follows:

"A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner

(a) knows of, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such longshoremen, and

(b) the shipowner fails to exercise reasonable care under the circumstances to protect the longshoremen against the danger." At 485.

The standard of negligence applied in *Santos* conforms to the standard on the same subject announced in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630–32, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). There, the Supreme Court refused to distinguish between licen-

---

**3.** *See Davison v. Pacific Inland Navigation Co., Inc.*, 569 F.2d 507 (CA9 1978); *Wescott v. Impresas Armadoras S. A. Panama*, 564 F.2d 875 (CA9 1977); *Shellman v. United States*

*Lines, Inc.*, 528 F.2d 675 (CA9 1975), and numerous district court cases, including *Gallardo v. Westfal-Larsen & Co.*, 435 F.Supp. 484 (D.Or.1977).

sees, trespassers and invitees and held that the one standard should be applied to all, that is "reasonable care under the circumstances of each case."

In the instructions to the jury, the district court defined negligence as follows:

"Negligence is the failure to exercise ordinary care. It is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances.

"Ordinary care is the care a reasonably prudent person would exercise under the same or similar circumstances.

"The term 'proximate cause' means a cause which in a direct sequence, unbroken by any new, independent cause, produces in whole or in part the injury complained of and without which that injury would not have happened. An injury may have more than one proximate cause."

Mammoth made no objection, nor took any exception, to this instruction on negligence as given by the court.

■ We now apply the standard of care outlined in *Santos* to the facts before us. In summary, the record shows that:

(1) Mammoth Fir was designed for no purpose other than a log carrier and that the steel stanchions provided by the vessel and used to secure the deck load were neither equipped with a device nor was there any procedure provided by which safety lines or nets could be attached to the stanchions.

(2) The failure to provide safety lines or nets to longshoremen lashing the log deck and working at the edge of the stack exposed longshoremen and, in particular, the appellee to a high risk of falling overboard and sustaining severe injuries.

(3) Mammoth had actual notice of the fact that the stevedore company could and would not rig safety lines or nets to protect longshoremen lashing the logs while working at the edge of the log deck and Mammoth knew that the stevedore would not provide such safety lines.

(4) Mammoth had actual knowledge of the fact that longshoremen were compelled to work near the edge of the logs in order to load and lash them and that walking or working near the edge of the logs created a high risk of slipping and falling off the edge of the deck load.

(5) The lashing was done at the direction of Mammoth with participation by its crew using a method chosen by it and dictated by the vessel's design and equipment. Mammoth's design of the load of logs, in and of itself, created an extremely high risk of falling to persons, such as appellee, working at the top edge of the log deck while attempting to lash the logs.

The evidence before us and the inferences to be drawn therefrom fully support the above summarization. There is substantial evidence to support the jury's verdict that Mammoth was negligent under the *Santos* standard.

■ Consequently, we conclude that the district court properly denied appellant's motion for a directed verdict and we, likewise, conclude that it properly rejected the requested instruction for a verdict in appellant's favor as to negligence. The fact that the court's instruction does not fully conform to the standard outlined in *Santos* is of no consequence. Appellant did not complain of the instruction, but relied entirely on the insufficiency of the evidence to show negligence on its part. On this state of the record, the nonconformance, if any, of the instruction with the *Santos* standard is completely harmless. Nor does the conceded negligence of the stevedore bar an action against Mammoth. The appellee may recover the full amount of his judgment against Mammoth, even though the stevedore was also negligent. This was settled in the recent case of *Edmonds v. Compagnie Generale Transatlantique*, —— U.S.

———, at ——————, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).

### III.

Finally, Mammoth alleges that the court erred in first reading to the jury Bachtel's contention that Mammoth failed to comply with the requirements of the Safety & Health Regulations for Longshoring, 29 C.F.R. §§ 1918.2 and 1918.32, and then instructing the jury that it could consider the regulations with other evidence. The latter section of the Code provides:

\*      \*      \*      \*      \*      \*

"(b) When an edge of a hatch section or of stowed cargo more than 8 feet high is so exposed that it presents a danger of an employee falling, the edge shall be guarded by a safety net or (sic) adequate strength to prevent injury to a falling employee, or by other means providing equal protection under the existing circumstances."

\*      \*      \*      \*      \*      \*

Prior to the 1972 amendments to the Act, it was well settled that a violation of the then existing regulations was a subject which was properly presented to the jury. *Provenza v. American Export Lines, Inc.*, 324 F.2d 660 (CA4 1963). Although the *Provenza* court was principally concerned with the doctrine of unseaworthiness, it also spoke to the issue of negligence. We quote:

"It follows, of course, that if the jury should find that the stevedore had violated the regulations such conduct could also constitute negligence. *If in turn the negligent conduct of the stevedore were known, or by the exercise of reasonable care should have been known to the shipowner, and such negligence of the shipowner was a proximate cause of the plaintiff's injury, then he too would be liable to the plaintiff on the additional grounds of negligence.*" *Id.* at 665. [Emphasis supplied.]

In *Boleski v. American Export Lines, Inc.*, 385 F.2d 69 (CA4 1967), the Fourth Circuit approved the doctrine announced in *Provenza*, stating that the judge may properly instruct the jury that a violation of the safety and health regulations may be considered as evidence of negligence. The court held:

"The Supreme Court denied certiorari in *Provenza* and this court has had no occasion to review it. It has been followed by the Second Circuit in *Reid v. Quebec Paper Sales & Transportation Co., Ltd.*, 340 F.2d 34 (1965), and the Fifth Circuit in *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131 (1964). Defendant has advanced no argument which disturbs or undermines the well-reasoned foundation of *Provenza* and we are not disposed to depart from its holding. *We find no error in the court's charge respecting the regulation.*" *Id.* at 74. [Emphasis supplied.]

The Fourth Circuit followed the same rule in *Venable v. A/S Det Forenede Dampskibsselskab*, 399 F.2d 347, 353 (CA4 1968).

However, since the enactment of the 1972 amendments eliminating the doctrine of unseaworthiness and restricting a longshoreman's recovery against the shipowner to negligence, the majority of the courts that have considered the regulations have limited their application to stevedores and held that they do not impose a duty on the shipowner. In the main, these cases arrive at their respective conclusions by holding that the provisions of 29 C.F.R. § 1918.2 expressly eliminate the shipowner from duties or obligations created by any one or more of the regulations. This section reads:

"(a) The responsibility for compliance with the regulations of this part is placed upon 'employers' as defined in § 1918.3(c).

"(b) It is not the intent of the regulations of this part to place *additional responsibilities or duties on owners*, operators, agents or masters of vessels unless such persons are acting as employers, *nor is it the intent of these regulations to relieve such owners, operators, agents or masters*

*of vessels from responsibilities or duties now placed upon them by law, regulation or custom."* [Emphasis supplied.]

Another proffered ground for the decisions of non-applicability of the regulations in the post-1972 period is that the cases such as *Provenza*, decided prior to the amendments, involved unseaworthiness, rather than negligence.

A casual reading of these authorities demonstrate that negligence *was* involved and emphasized in each one of the pre-1972 authorities. The post-1972 authorities speaking to this question entirely overlook the language of the mentioned section of the regulation which provides, in substance, that it *does not relieve owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation, or custom.* In fact, § 1918.2 has remained unaltered since the regulations were originally promulgated in 1960, pursuant to 33 U.S.C. § 941. The same is true of § 1918.32(b) which was the basis for the district court's instruction in this case. Consequently, the specific language of § 1918.2, and the cases interpreting that section continue to bind the owner.

The post amendment cases are cited and briefly analyzed in *Chavis v. Finnlines, Ltd. O/Y*, 576 F.2d 1072, 1082 (CA4 1978). The *Chavis* court erroneously emphasized that *Provenza* dealt only with an unseaworthy condition when, in fact, the decision was also concerned with negligence. *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (CA5 1977), and *Brown v. Ivarans Rederi A/S*, 545 F.2d 854 (CA3 1976), cited in support of the conclusion that the regulation cannot be utilized by a longshoreman against the shipowner, rely on the same basic error and on the unwarranted interpretation of 29 C.F.R. § 1918.2.

Although § 1918.2 makes it clear that the regulations do not place *additional responsibilities or duties* on owners, operators, and others, it likewise makes it crystal clear that the regulations do not relieve the owners, operators, or masters from responsibilities or duties then placed upon them by law, regulations, or custom. The designing of a 20–30 foot deck load of logs without adequate safeguards at the sides could well have been viewed as evidence of negligence under the *law* as it existed prior to 1972. This design along with the failure to provide protective nets or other devices would be presented to a jury under the customary definition of negligence. That is to say, the regulations here required nothing more than the due care required under the doctrine of negligence as it existed in maritime law prior to 1972.

We must assume that Congress was aware of the *Provenza, Bolenski* and *Venable* decisions, which held that the regulations applied to negligence on the part of the shipowner, at the time it passed the 1972 amendments. The negligence mentioned in 33 U.S.C. § 905(b), therefore, would necessarily include a violation of the then existing law and regulations, including § 1918.32(b), the subject of the court's instruction challenged by appellant. *See Shapiro v. United States*, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954).

Although neither the 1972 amendments, nor the regulations here mentioned, were involved in *Reyes v. Vantage S.S. Co., Inc.*, 558 F.2d 238 (CA5 1977), we suggest that the rule stated there is a proper one to be utilized in deciding whether the regulations under scrutiny should be here applied. In *Reyes*, the court held that where a statute was intended to protect the class of people to which a plaintiff belongs against risk of the type of harm which has in fact occurred, violation of such statute is negligence in itself. The court went on to say that inherent in the statement of the legal principle were three questions which should be resolved before liability could be imposed on a negligence theory: (1) was there a violation of the regulations; (2) were the regulations designed to protect the plaintiff; and (3) were they intended to protect

against the risk of the kind of harm that occurred? *Id.* at 242. Here, the evidence supplies all three elements beyond question.

In general, the regulations, which were promulgated under 33 U.S.C. § 941, were intended to eliminate the risk of injury to all longshoremen and not just to those who exercise prudence. *Denny v. Jugoslavenska Oceanska Plov,* 455 F.2d 1277, 1278 (CA5 1972). The regulations might prove helpful in suggesting types of measures deemed necessary for maintenance of a safe ship. *Darwin v. United States,* 435 F.Supp. 501, 507 (N.D.Cal.1977), and are binding on the shipowner where he knew or should have known of a violation of the safety regulations. *Anuszewski v. Dynamic Mariners Corp. Panama,* 391 F.Supp. 1143, 1145 (D.Md.1975), *aff'd* 540 F.2d 757 (CA4 1976).

■ Here, the trial judge did not instruct that Mammoth was negligent as a matter of law in failing to comply with the regulation. He submitted the regulation to the jury, along with all other evidence, so that the members might determine whether Mammoth was guilty of negligence. This would be the proper course to follow under all of the pre-1972 cases on the subject. We observe no real distinction between the requirements of a statute as mentioned in *Reyes,* and the requirements of the regulation presented to the jury by the district court. The court properly presented the regulation for the jury's consideration.

## IV.

As previously mentioned, the stevedore intervened in these proceedings to assert its lien on the Bachtels' recovery for the amount of compensation it had paid pursuant to 33 U.S.C. § 933. Its claim of lien approximates $33,000.00. The Bachtels recognized the validity of the lien, but claimed that the efforts of their attorney were responsible for recovering the fund on which the lien was claimed and, consequently, the stevedore should contribute its proportionate share of the attorney fees and costs.

The district court rejected the Bachtels' claim and adopted what is commonly known as the "Fund" rule under which the attorney fees come off the top of the recovery, then the lien is paid in full and the injured party receives the residue. This theory received support in *Cella v. Partenreederei MS Ravenna,* 529 F.2d 15 (CA1 1975), *cert. denied* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976). The "Fund" rule was first announced in *Fontana v. Pennsylvania R. Co.,* 106 F.Supp. 461 (S.D.N.Y.1952), *aff'd mem. sub nom. Fontana v. Graceline, Inc.,* 205 F.2d 151 (CA2 1953), *cert. denied* 346 U.S. 886, 74 S.Ct. 137, 98 L.Ed. 390. This approach was enforced in *Valentino v. Rickners Rhederei G. M. B. H., etc.,* 552 F.2d 466 (CA2 1977), in which the Second Circuit reversed the district judge's adoption of a "pro-rata" approach in his opinion, 417 F.Supp. 176 (E.D.N.Y.1976). This type of distribution appears to follow the scheme which is set up in the statute with reference to recoveries obtained by the stevedore under 33 U.S.C. § 933(e).

The "Fund" approach, in our view, places an unconscionable burden upon the injured person. For example, there are probably many cases where the recovery might exceed the stevedore's lien by a minimal amount. In such case, the stevedore would get the full benefit of the services of plaintiff's attorneys, yet contribute nothing, time or money, to the recovery.

The equitable approach, in our view, is that adopted in *Swift v. Bolten,* 517 F.2d 368 (CA4 1975). There, the district court held that the stevedore's lien took priority over the attorney fees. The Fourth Circuit, in reversing, adopted the "pro-rata" approach. Relying on settled equitable principles stated in *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), *rehearing denied* 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834; *Sheris v. Travelers Ins. Co.,* 491 F.2d 603 (CA4 1974), *cert. denied* 419 U.S. 831, 95 S.Ct. 54, 42 L.Ed.2d 56, and on the fact that the conflicts of interest between the longshoreman and the stevedore

were eliminated by the amendments of 1972, the court held that where the stevedore's pecuniary advantage was secured through the services of counsel employed by the longshoreman, the stevedore should be taxed with a proportionate share of the reasonable fee of the longshoreman's counsel.

In rejecting the fund approach stated in *Valentino*, the Fifth Circuit in *Mitchell v. Scheepvaart Maatschappij Trans-Ocean*, 579 F.2d 1274 (CA5 1978), said: ".  .  . This measured, arithmetic ranking cannot be defended on equitable principles unless we view the longshoreman as the only party who is, for some reason, not entitled to the chancellor's consideration." *Id.* at 1279. In rejecting the "Fund" or statutory approach, the *Mitchell* court noted that not only is the statute silent on the subject, but that the equitable lien itself is a judicial creation. *See Allen v. Texaco, Inc.*, 510 F.2d 977, 979–980 (CA5 1975). Additionally, the *Mitchell* court declined to follow the *Cella* court's determination and stated that the purpose of the 1972 amendments was to increase the amount of money available for compensation purposes. *Mitchell* also held that the ends of justice were better served by encouraging third party suits by the longshoremen. In criticism of *Cella*, *Mitchell* stated that its holding would discourage suits by longshoremen because they would be unwilling to sue unless they could be rather certain of recovering an amount substantially in excess of the lien. After further analysis, *Mitchell* went on to recognize that while the pro-rata approach stated in *Swift* might be appropriate in many cases, it would not adopt it as a hard and fast rule. It suggested in some cases the recovery might be large enough so that the entire attorney fee should be paid by the injured person. The *Mitchell* court concluded by suggesting a "balancing" approach which would consider the reasonableness of the fees, the services rendered, and the equities involved.

■ The Ninth Circuit has not spoken upon the problem. Upon reflection we forecast nothing but trouble and confusion in attempting to apply the *Mitchell* "balancing" formula. The guidelines are so vague that an appeal could be expected in a substantial number of the cases. The "Fund" approach stated in *Cella*, *Fontana*, and *Valentino* is unfair and in many instances would work a devastating hardship on the injured person. The *Swift* "pro-rata" formula is easy to apply and is completely in line with equitable principles as well as Congress' intent in adopting the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act. On this record, we adopt the *Swift* "pro-rata" rule as the law to be applied in the Ninth Circuit. This disposition is in line with Judge Solomon's able opinion in *Brown v. American Mail Line, Ltd.*, 437 F.Supp. 628 (D.Or.1977).

We leave to another day a decision on the proper rule to be applied where the longshoreman recovers a judgment no greater than the lien of the stevedore-employer.

## CONCLUSION

The judgment is affirmed except as to the application of the award of attorney fees. With reference to the attorney fees, the cause is remanded to the district court for application of the "pro-rata" formula adopted in *Swift v. Bolten, supra*.

AFFIRMED AS MODIFIED.

Appendix A to follow.

Appendix A