**Marta E. ROSS, Plaintiff,**

v.

**BEAUMONT HOSPITAL, Gerald Wilson, John Murphy, Defendants.**

**Civ. A. No. 86–CV–70072–DT.**

United States District Court,
E.D. Michigan, S.D.

May 19, 1988.

**1116**

Thomas G. Rollins, Detroit, Mich., for plaintiff.

Terence V. Page, Birmingham, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

Two motions are pending in the instant case, both of which are opposed.[1]

This Court heard oral argument on the motions during a hearing on April 5, 1988, and thereafter took the issues in controversy under advisement. Because the issues which have been raised by the Defendants could potentially moot the request for reconsideration by the Plaintiff, Marta Ross, they will be initially examined by this Court.

---

1. Defendants filed a "Motion for Judgment Notwithstanding Verdict or in the Alternative, New Trial." Plaintiff filed a "Motion for Reconsideration."

Defendants, Beaumont Hospital [Hospital], Gerald Wilson and John Murphy, seek to set aside the verdict that had been rendered by a jury in Ross' favor on her claims under the Federal Rehabilitation Act, 29 U.S.C. § 794, the Michigan Handicapper's Civil Rights Act, M.C.L.A. § 37.1101, *et seq.*, and the Elliott–Larsen Civil Rights Act, M.C.L.A. § 37.2101, *et seq.* The jury also concluded that Wilson and Murphy had intentionally and wrongfully interferred in Ross' relationship with the Hospital.[2] In a Memorandum Opinion and Order, dated January 15, 1988, 678 F.Supp. 655, this Court concluded that the Defendants had not discriminated against Ross on the basis of her sex in violation of Title VII, 42 U.S.C. § 2000e et seq. The factual summary, which was set forth in the Memorandum Opinion and Order, is incorporated by reference for the purpose of this motion.

The Sixth Circuit Court of Appeals has held that a Judgment Notwithstanding the Verdict (JNOV) is appropriate only when reasonable minds could not differ as to the conclusions to be drawn from the evidence.[3] Thus, if the Court determines that the evidence points so strongly in favor of a movant that reasonable minds could not reach a different conclusion, a JNOV motion should be granted.[4] All reasonable inferences must be drawn in favor of the non-movant.[5]

■ As a preliminary matter, Ross argues that the Defendants cannot obtain a JNOV because they did not seek a directed verdict at the close of all the evidence. This is incorrect. Despite this assertion,

Ross' own brief recognizes that the Defendant's motion was renewed on March 11, 1987.[6] *Fed.R.Civ.P.* 50(b) states that:

Whenever a motion for directed verdict made at the close of all the evidence is denied or *for any reason is not granted,* the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.

(Emphasis added). Thus, even if the Court did not formally rule on the Defendants' motion, this non-event is insignificant since their request was clearly "not granted." [7]

The case of *DeMarines v. KLM Royal Dutch Airlines,*[8] which was cited by Ross, is distinguishable and inapposite to this controversy because KLM failed to make a motion for a directed verdict at the close of the evidence.[9] The approach of *DeMarines* has also been criticized as being harsh and demagogic.[10] Thus, Ross' argument (to wit, that this issue has not been preserved for appeal) is without merit.

The Court shall now address the Defendants' request for the entry of a JNOV.

1. *Section 504 of the Federal Rehabilitation Act*

Section 504 of this Act provides:

No otherwise qualified handicapped individual in the United States as defined in § 706(7) of this Title, shall, *solely* by reason of [her] handicap, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal financial assistance ...

---

**2.** The jury found that (1) Ross was *not* discriminated on the basis of her sex in violation of the Elliott-Larsen Civil Rights Act of Michigan, (2) she was *not* the subject of a conspiracy to discriminate among (or between) the Defendants, and (3) Defendants did *not* breach the terms of any implied contract (to wit, that Ross' staff privileges would not be revoked in the absence of just cause).

**3.** *Toth v. Yoder Co.,* 749 F.2d 1190 (6th Cir. 1984).

**4.** *Morelock v. NCR Corporation,* 586 F.2d 1096, 1104–1105 (6th Cir.1978).

**5.** *Id.* The Michigan JNOV standard is identical. *See Matras v. Amoco Oil Co.,* 424 Mich. 675, 682, 385 N.W.2d 586 (1986).

**6.** The record does not indicate that this Court formally ruled on the Defendants' motion.

**7.** *See e.g. Norton v. Snapper Power Equipment Division of FUQUA,* 806 F.2d 1545 (11th Cir. 1987).

**8.** 580 F.2d 1193 (3d Cir.1978).

**9.** *Id.* at 1195.

**10.** *Bachtel v. Mammoth Bulk Carriers, Ltd.,* 605 F.2d 438 (9th Cir.1979).

(Emphasis added). Ross has claimed handicap discrimination on the basis of her narcolepsy. Defendants argue that the jury verdict is unsupportable because she failed to prove that the claimed handicap was unrelated to her ability to perform as a surgeon. They also contend that no reasonable view of the proofs would permit a conclusion that Ross had been terminated "solely" because of her handicap.

Ross responds by noting that two medical doctors opined during the trial that (1) medication controlled her narcolepsy, and (2) her surgical abilities had not been adversely affected by this physical malady. Moreover, she asserts that her narcolepsy was a factor which the Defendants utilized when they decided to terminate her relationship with the Hospital. Finally, Ross posits that her only post-medication sleeping incident occurred during a committee meeting—not during any surgical procedure. However, she contends that this incident was precipitated by a cold medication—not narcolepsy—and caused no harm to any patient.

In *Jasany v. United States Postal Service,*[11] the Court of Appeals for the Sixth Circuit addressed the issue of an allocation of the burden of proof under Section 504. The Court incorporated the approach in *Pushkin v. Regents of University of Colorado,*[12] which included the following steps in the proof allocation:

1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person *apart from* his handicap, and was rejected under circumstances which gave rise to the inference that his rejection was based solely on his handicap;

2) Once plaintiff establishes his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program's requirements *in spite of* his handicap, or that his rejection from the program was for reasons other than his handicap....[13]

Thus, once the Plaintiff has met her prima facie obligation, the ultimate burden of proof shifts to the Defendant.[14] Even if the Defendant meets this burden, the Plaintiff can rebut, or attempt to rebut, the opposition's proofs by demonstrating that the Defendant's reasons are "based on misconceptions or unfounded conclusions [and] encompass unjustified consideration of the handicap itself."[15]

As a part of the *prima facie* case, the rejection must have occurred "under circumstances which give rise to the inference that his rejection was based *solely* on his handicap."[16] The use of the word "solely" is derived from the statute.

After a review of all of the evidence, and giving all reasonable inferences to, and in favor of, Ross, it is quite apparent that reasonable minds could only conclude that her termination from the Hospital was *not* based solely on her handicap. In particular, the circumstances of her termination unequivocally show that Ross' abusive behavior was a more significant factor in the Defendants' decision to terminate her than the handicap issue. Thus, this Court concludes that she was not terminated solely on the basis of the handicap.[17]

There are several reasons for this conclusion. First, the evidence shows that the

---

**11.** 755 F.2d 1244, 1249 n. 5 (6th Cir.1985).

**12.** 658 F.2d 1372 (10th Cir.1981). The *Jasany* Court rejected the positions which had been adopted by the Eighth and Second Courts of Appeal. *See Norcross v. Sneed,* 755 F.2d 113 (8th Cir.1985); *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981).

**13.** *Id.* at 1387

**14.** *See* Comment, *Section 504 of the Rehabilitation Act,* 32 U.Pa.L.Rev. 867, 892 (1984).

**15.** 658 F.2d at 1387.

**16.** *Id.* (emphasis added).

**17.** Inasmuch as the *Jasany* approach places a heavier burden on the Defendant than the Courts of Appeal in the Eighth or Second Circuits, the conclusion of this Court with regard to this issue presumptively means that a JNOV would have been granted under their alternative standards.

events which precipitated Ross' termination had a direct relationship to her egregious behavior in the Hospital.[18]

18. As an example, several nurses had complained to their immediate superiors about some incidents at the Hospital in April 1985 when Ross became abusive to them. Ross was terminated from the Hospital by Wilson on May 23, 1985 shortly after these incidents had been reported to, and investigated by, him. Ross' last sleeping incident occurred in late 1984.

19. The following behavior incidents are contained in Ross' personnel file. However, it should be noted that this Court does not assume the truthfulness of the statements within the Ross personnel file. The itemization of the incidents within this file have been set forth for the sole purpose of identifying the facts which, according to the trial record, were relied upon by the Hospital.

8/29/77—member of patient's family complains of abusive verbal treatment by Ross;

1/25/78—patient complains of abusive verbal treatment by Ross;

1/31/78—mother of patient-daughter complains of abusive verbal behavior by Ross;

2/1/78—patient complains of abusive verbal behavior by Ross;

2/8/78—nurse complains that when she advised Ross of an error she had placed on the chart, Ross replied it was no concern of hers;

3/10/78—two nurses complain of abusive verbal behavior by Ross;

3/31/78—operating room attendant complains that when Ross was advised she had contaminated the sterile field, Ross replied no one had the guts to do anything about it;

3/31/78—nurse complains Ross' reluctance to practice good sterile technique in the operating room;

5/11/78—nurse complains of intimidating antics, cruelty, poor treatment of other hospital personnel and the public by Ross;

6/7/78—Dr. Bernard Eisenstein, Chief, Ambulatory Patient Services, counsels Ross that nurses are threatening to quit working for the hospital because of rudeness and belligerence by Ross;

7/7/78—parents of patient refuse to pay bill because of alleged unprofessional behavior by Ross;

5/5/79—Ross meets with Wilson, Medical Director of the Hospital;

5/21/79—patient complains of unprofessional conduct by Ross;

7/7/79—Ford Motor Company plant doctor requests Ross not see any of the patients from the Ford Motor Company;

1/16/80—file memo indicates Ross is inconsiderate with nurses in Critical Care;

5/5/81—nurse complains of abusive verbal conduct in Critical Care Unit;

5/31/81—three nurses complain of abusive verbal conduct by Ross;

Second, Ross' personnel file, which had been relied upon by Wilson, was replete with numerous instances of Ross' abusive behavior [19] and, comparatively, very few

6/15/81—Murphy, Chief of Surgery, meets with Ross regarding abusive verbal behavior toward the nursing staff;

6/30/81—nurse complains of abusive verbal behavior by Ross;

7/2/81—nurse complains of abusive verbal conduct by Ross;

8/24/81—Ross is placed on probation for a period of six months because of disruptive behavior in dealing with Hospital personnel by Wilson and Murphy;

9/17/81—Director of Nursing complains to Hospital Medical Director of abusive behavior by Ross toward nursing staff;

4/26/82—Wilson and Hutchins meet with Ross regarding her weight problem and concern that the problem can impact on patient care;

5/7/82—nurse complains of abusive verbal conduct by Ross;

5/19/82—nurse complains of abusive verbal conduct by Ross;

5/25/82—Murphy meets with Ross regarding efforts to improve her behavior and relationships with the nursing staff;

8/10/82—Murphy, Chief of surgery, advises Wilson that Ross is not performing at an acceptable level of competency at this point. He states he bases this on the fact that she 1) is extremely overweight and has difficulty in approaching the operating table, 2) is unable to operate within the depths of the wound, 3) becomes acutely short of breath while operating, and 4) is suffering from knee problems which are probably associated with her weight and requires the use of a walker;

9/14/82—Ross returns from medical leave of absence and is placed on a period of probation for six months with the following conditions: 1) remain alert during operative procedures; 2) provide a monthly letter from a physician treating her obesity, 3) maintain an acceptable behavior pattern at the hospital, and 4) meet with the Medical Director monthly to review progress;

10/12/82—Wilson and Hutchins meet with Ross regarding her probationary status;

12/13/82—Wilson and Hutchins meet with Ross regarding her probationary status;

1/7/83—Wilson meets with Ross regarding her probationary status;

2/14/83—Wilson meets with Ross regarding her probationary status;

3/4/83—Wilson meets with Ross regarding her probationary status;

4/20/83—Ross is advised by Wilson that she is removed from probationary status but that the guidelines outlined in her probationary letter are continued;

4/21/83—two laboratory assistants complain of abusive verbal behavior by Ross;

6/30/83—Wilson meets with Ross regarding non-compliance with the terms of her probation termination;

sleeping incidents. No reasonable mind could possibly have concluded that Ross' termination was based "solely" on her handicap. It is clear that the reported incidents of Ross' abusive behavior played a more significant role in causing Wilson to recommend her final termination than her narcolepsy handicap.

Third, the letter in which Wilson informed Ross of her termination from the Hospital included a reference to the narcolepsy problem. However, his letter also advised Ross that she had violated certain key Hospital guidelines, including her "inability or unwillingness to maintain an acceptable behavior pattern...."

Fourth, the testimony at trial independently confirmed much of the material in the personnel file regarding Ross' behavior and showed conclusively that her behavior was not a pretextual reason for the Defendants' actions. Shawn Livermore, a Hospital nurse, opined that Ross' behavior, which included episodes of screaming at nurses, was the worst of any of the physicians with whom she came in contact at the Hospital. Several nurses spoke of their fears of Ross. Most of Ross' behavioral incidents, to which reference was made during the trial, were not directly contradicted by her. She repeatedly maintained that her impetuousness on certain occasions was due to her frustration with staff incompetence. Yet, there is no evidence that any other doctors acted in a similar manner despite this alleged level of incompetence among the Hospital staff.[20] For example, Ross never denied that she instructed a nurse to "get some morphine, take it in [to the patient], close the door and finish it."[21] In response, Ross asserts that the statement was only made in jest.

Fifth, it would be a misapplication of the Federal Rehabilitation Act if the Hospital could be found to have discriminated against Ross when all of the evidence suggested that she had a sleeping problem which had not been completely corrected. Ross acknowledged having experienced a concentration problem during one surgical procedure.[22] There is no evidence of any animus in the Hospital's concern with her sleeping—the only concern apparent was

8/24/83—Wilson meets with Ross advising her that she is becoming disruptive again and references abusive verbal conduct toward a laboratory assistant;

9/24/83—She does rounds in wheelchair;

11/5/83—nurses complain of abusive verbal conduct by Ross in the Intensive Care Unit;

11/28/83—nurses complain of abusive verbal conduct by Ross in the Critical Care Unit;

12/23/83—nurse complains of abusive verbal conduct by Ross;

1/5/84—Hutchins meets with Ross regarding her relations with Hospital personnel and its interference with patient care;

3/23/84—nurse complains to Wilson that Ross is becoming disruptive in the operating room mentioning a total lack of cooperation with the scrub and circulating nurses, use of foul language, telling a nurse to order her a pizza, or else she will not sign an operative permit.

3/27/84—Wilson meets with Ross regarding rudeness and abusive behavior toward Hospital personnel;

8/9/84—eight operating room staff members complain that the largest disposable operating gown did not sufficiently cover Ross such to violate the optimum asceptic environment in the operating suite;

9/12/84—nurse complains of abusive verbal conduct by Ross;

9/18/84—nurse complains of abusive verbal conduct by Ross;

10/31/84—Ross is observed at least three times falling asleep while assisting Wilson with surgery;

11/12/84—nurses advise Ross was sleeping at the nursing station at 2:00 p.m. with the phone to her ear;

11/28/84—Wilson and Hutchins meet with Ross regarding abuse to personnel and sleeping at inappropriate times;

4/24/85—nurse complains of two instances of abusive verbal conduct by Ross;

5/14/85—Murphy meets with Ross regarding two complaints about behavior and remarks made to nursing staff on April 27 and 28, 1985;

5/23/85—Ross advised that her staff privileges are terminated.

20. There was evidence that other physicians—all male—acted improperly with staff. However, none of them were as consistently abusive to the Hospital staff as Ross, according to the Defendants and their supporting witnesses. Details of her behavior are contained within the January 15, 1988 "Memorandum Opinion and Order" of this Court.

21. Memorandum Opinion at 670.

22. Several witnesses testified that they saw Ross fall asleep on that occasion. This was denied by Ross.

for the safety and general welfare of the Hospital's patients.[23] It is without question that a hospital must be able to take appropriate precautionary measures against such potential dangers to patients.[24]

An excellent and detailed commentary on the burden of proof on this subject states:

Where the lives of critically ill patients are at stake, public policy may dictate exclusion if there is any doubt concerning an individual's ability to serve such patients. To use the allocation of the burden of proof as a means of addressing this concern, however, would be a mistake. There are more suitable methods of analysis to protect valid exclusions. As previously discussed, program operators may establish eligibility criteria that reflect their legitimate needs to ensure the public safety. A nursing or medical school is entitled to ensure that persons who serve as hospital staff present no significant safety risk to patients. A medical school might legitimately contend that no individual who may foreseeably cause significant injury to patients should be permitted on its staff. If it can then demonstrate, for example, that an individual with a history of mental disability may foreseeably cause significant injury, it will have carried the requisite burden of persuasion.[25]

This analysis applies perfectly to the kind of prudential concerns which were shown by the Hospital to Ross' physical malady. This Court is well aware that there is no evidence of an injury to a patient as the result of Ross' narcolepsy. However, there is no competent evidence that the Hospital's actions constituted any kind of "discrimination" in violation of the Rehabilitation Act.

Thus, the jury verdict on this issue cannot stand. The record indicates that the build up of Ross' bad behavior over an extended period of time was a major factor which the Defendants employed in making their collective decision to terminate her relationship with the Hospital. Clearly, Ross' termination was not caused "solely" by her handicap.

### 2. State Handicap Discrimination

M.C.L.A. § 37.1202(1)(b) states:

An employer shall not ... [discharge] or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a handicap that is, unrelated to the individual's ability to perform the duties of a particular job or position.

■ Defendants contend that no reasonable minds could have found any evidence which would have established a violation of this statute. After carefully examining the trial record as well as relevant Michigan case and statutory authority, this Court agrees.

One aspect of the definition of a handicap under Michigan law is that it "is *unrelated* to the individual's ability to perform the duties of a particular job or position, or is *unrelated* to the individual's qualifications for employment or promotion."[26] In *Carr v. General Motors Corp.*,[27] the Michigan Supreme Court adopted a very literal reading of the statute and held that "the clear legislative intent was that only those whose disability is *unrelated* to ability to perform the job be

---

23. *See Southeastern Community College v. Davis*, 442 U.S. 397, 413 n. 12, 99 S.Ct. 2361, 2371 n. 12, 60 L.Ed.2d 980 (1978) (nursing school allowed to "to ensure that no graduate will pose a danger to the public in any professional role in which he or she might be cast").

24. *See Doe v. Region 13 Mental Health—Mental Retardation Commission*, 704 F.2d 1402, 1410 (5th Cir.1983) (absent discriminatory animus, professional concerns that a suicidal psychiatric worker with a borderline personality disorder might be ill suited to treat troubled patients

which led to her discharge could not constitute handicap discrimination).

25. Wegner, *The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap Under Section 504 of the Rehabilitation Act of 1973*, 59 Cornell L.Rev. 401, 490 (1984).

26. M.C.L.A. § 37.1103.

27. 425 Mich. 313, 389 N.W.2d 686 (1986) (emphasis added).

covered by the HCRA...."[28] The Court later pointed out that the legislative history "reinforces the clear language of the statute which states continuously throughout its provisions that the handicap must be 'unrelated to ability to perform."[29]

In order for the jury verdict to remain, Ross must have produced a sufficiency of evidence which would show that her narcolepsy is a disability that is unrelated to her ability to perform as a surgeon. On the basis of the record, this Court is of the view that no reasonable minds could have so found. Therefore, this Court must set aside the jury verdict.

The trial evidence was uncontradicted that Ross had several sleeping episodes in the operating room prior to undertaking medication. It is axiomatic that basic alertness during an operative procedure is a fundamental part of being a surgeon. The Michigan Handicapper's Act provides Ross no protection since this disability was obviously related to her ability to perform as a surgeon.

Even after she began to take medication, the evidence was uncontradicted that she had at least one sleeping incident and several alertness problems. In its Memorandum Opinion of January 15, 1988, this Court stated:

> [t]here were several references to post-medication sleeping episodes by her during the trial. For example, in October 1984, she was reported to have fallen asleep during an operation with Wilson. During the following month (November 1984), she was seen sleeping with a phone in her ear. Lastly, she was said to have fallen asleep at a committee meeting.

Ross has denied sleeping in the operating room. With regard to the October 1984 incident in the operating room, Ross submits that she felt ill because of the high temperature in the operating room, and received permission from Wilson to briefly sit and rest her eyes.

Ross' version appears to be somewhat flawed, in that the trial record suggests that, while nodding, her head fell close to the patient's wound which, in turn, endangered the requisite degree of needed sterility. Indeed, Livermore testified that she saw Ross sleeping and leaning against the patient. *Moreover, it appears that much of her sleeping problems were connected to an inability to concentrate. Thus, even if she was not sleeping, she was having difficulty in concentrating while performing surgery.*

*Ross does not deny those other incidents which occurred outside of the operating room,* explaining that they were probably caused by problems with her medication dosage. Nonetheless, these unpleasant episodes suggest that Ross continued to have sleeping problems even after receiving her medication.[30]

Therefore, under the *Carr* standards, this Court must conclude that no reasonable minds could find that her disability is "unrelated" to her ability to perform the job.

In addition, Michigan case law makes clear that a person who has a disability which could potentially endanger a third party by her job performance is not handicapped under the Act. In *Dauten v. Muskegon County*,[31] the court stated:

> After applying for a position as a lifeguard, plaintiff was given a physical examination. She disclosed that she had injured her back in two separate automobile accidents and was being treated by a chiropractor for a mild scoliosis. Defendant's examining physician, who testified at trial, recommended against hiring plaintiff because of her back problems. At trial, defendant's examining physician testified that scoliosis, lateral curvature of the spine, is a structural defect in the back. Physical stress, such as heavy lifting, could result in muscle spasms in

---

**28.** *Id.* at 315–316, 389 N.W.2d 686 (emphasis added).

**29.** *Id.* at 319–320, 389 N.W.2d 686. *See also id.* at 321, 389 N.W.2d 686.

**30.** Memorandum Opinion at 671 (emphasis added).

**31.** 128 Mich.App. 435, 437–438, 340 N.W.2d 117 (1983). (Emphasis added)

the back. He also testified that a lifeguard would be under significant stress in a life-saving situation. She would be prone to back spasms in such a situation. These spasms *might* render the person suffering them "ineffective", i.e., without control of her muscular movements. Spasms of this type suffered in a real life-saving situation would endanger the lives of the lifeguard and the person he or she was trying to save.

We cannot agree with plaintiff's interpretation of the Handicappers' Civil Rights Act. We need not consider the danger to plaintiff herself to sustain the decision of the trial court. Dr. Fugate, who testified both as defendant's examining physician and as an expert, stated that plaintiff's condition *could result* in spasms causing a loss of physical control in a life-saving situation. *Even if a lifeguard never has to attempt to save a life,* her ability to do so is still perhaps the most important factor to be considered in making a decision to hire. A physicially determinable characteristic which *may* disable a lifeguard in a life-saving situation is a handicap that is related to the applicant's "ability to perform the duties of a particular job."

*Dauten* makes clear that even a *potential* danger is enough to mean the disability is job related and, thus, not subject to the protections of the Act. Such facts perfectly describe the situation here.[32] Accordingly, the Defendants are entitled to a JNOV on this issue.[33]

### 3. *State Weight Discrimination*

M.C.L.A. § 37.2202(1)(a) states that "... (an) employer shall not ... (f)ail or refuse to hire, or recruit, or discharge or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, *weight,* or marital status." (Emphasis added).

■ Defendants assert that Ross failed to produce evidence that would have allowed reasonable minds to conclude that her weight "was a motive or reason which made a difference in the determination to terminate her privileges."[34] In response, Ross points to the evidence which, in her judgment, proved that her weight played a role in the Defendants' decision to terminate her Hospital privileges.[35]

Although there appear to be no known cases in Michigan which specifically address the burden of proof issue in a weight discrimination case, the same statutory provision which covers weight discrimination claims also encompasses acts of discrimination on the basis of height and age. By analogy, this Court believes that the cases in those areas provide the appropriate authority for determining the burden of proof here.

In *Matras v. Amoco Oil Co.,*[36] the Michigan Supreme Court, in holding that a plaintiff must show that age was a "determining factor" or "but-for" cause of the discharge, wrote:

Another formulation would be that age is a determining factor when the unlawful adverse action would not have occurred without age discrimination.[37]

Therefore, in order to resolve this issue, the Court must determine whether reason-

---

**32.** *See also Allen v. SEMPTA,* 132 Mich.App. 533, 349 N.W.2d 204 (1984); Keinbaum, Hardy, *Labor Law* (1984 Annual Survey of Michigan Law), 31 Wayne L.Rev. 687, 702.

**33.** In granting the JNOV, the Court has reevaluated its directed verdict decision. However, in doing so, the Court has had time to reevaluate the evidence and examine the case law more carefully than it could in the midst of trial.

**34.** Defendants' Brief at 10, *citing Micu v. City of Warren,* 147 Mich.App. 573, 382 N.W.2d 823 (1985) (weight discrimination case).

**35.** Ross relies on the testimony that (1) her weight did not affect her surgical abilities, and (2) Wilson obtained a letter from a Dr. Smith to whom Wilson allegedly made some material misrepresentations regarding her weight. There was also testimony that the Hospital Committees made their decision after being advised about Ross' weight.

**36.** 424 Mich. 675, 682, 385 N.W.2d 586 (1986).

**37.** *Id.*

able minds could have concluded that Ross' discharge would not have occurred but for the Defendants' consideration of her weight.[38]

One important aspect of the standard for evaluating a request for a JNOV must be reemphasized at this point. The reviewing court is simply *not* allowed to *weigh* evidence or assess credibility. The Court of Appeals for the Sixth Circuit in *Morelock v. NCR Corp.*[39] stated:

> In determining whether the evidence is sufficient, the trial court may neither *weigh* the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury.

The standard for determining an impermissible weighing of the evidence is gleaned from the *Morelock* court which concluded that "the trial court may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its judgment for that of the jury."[40] If there must be any weighing of the evidence, then a JNOV would be inappropriate under the circumstances.[41]

In the instant case, the Court believes the weight of the evidence shows that Ross' weight was not a "but-for" cause of her discharge. The trial evidence clearly supports the Defendants' contention that Ross' behavior was a decisive factor in their decision to discharge her from the Hospital medical staff. However, for reasons which have already been noted, this Court must only determine if there was any evidence which would have allowed reasonable minds to find that weight was a determining factor in the Defendants' consideration of Ross' future tenure at the Hospital. Based on this standard, the Court believes that such evidence does exist.

In his May 23, 1985 letter of suspension to Ross, Wilson wrote:

> Your appointment on the Medical staff of William Beaumont Hospital–Troy is suspended effective as of this date because of repeated instances of failure to comply with the guidelines in a letter to you on April 20, 1983 ... particularly your inability or unwillingness to "maintain an acceptable behavior pattern" and your failure *"to provide a monthly letter from the physician treating your obesity."* This decision is based upon my professional judgment and such action is being taken in the best interest of the Hospital and its patients.

(Emphasis added). On the basis of this letter, a jury could have reasonably concluded that Ross' obesity made a difference in the Defendants' decision to terminate her services. Her obesity was explicitly identified as one of the determining factors.

Ross also produced evidence which showed that various medical committees at the Hospital were aware of Wilson's concerns, and other information, regarding her weight. This evidence could also have led a jury to determine that Ross' weight was a determining factor. In addition, the irregularity of Wilson's request for obesity letters, and his unusual actions in using Ross' weight problem to secure a negative letter from Smith, supports her position on this issue.

Moreover, a jury could have reasonably found that her weight did not constitute a valid bona fide occupational requirement. This Court recognizes that the Defendants produced evidence which suggested that

---

**38.** Defendants argue that the decision to terminate Ross was based on her narcolepsy. Yet, the evidence at trial made clear that weight was certainly a factor in their evaluation of her relationship with the Hospital, as discussed *infra*.

**39.** 586 F.2d at 1104 (emphasis added).

**40.** *Id. See also National Polymer Products v. Borg Warner Corp.*, 660 F.2d 171, 178 (6th Cir. 1981).

**41.** In granting a JNOV on the prior claims, the Court did not "weigh" any evidence. Instead, it assumed all reasonable inferences in favor of the Plaintiff and found that a jury could not have reasonably found (1) the Defendants' decision to discharge Ross to have been based solely on her handicap or (2) Ross' narcolepsy was "unrelated" to her abilities as a surgeon.

Ross' operating effectiveness had been hindered by her weight. However, she correctly notes that the same doctors, who voiced these criticisms, continued to work with her. In addition, Ross presented testimony from other physicians who opined that a person's weight need not interfere with a surgeon's ability to reach the depths of a patient's wound. Although it is true that the Defendants produced testimony that Ross' weight made it difficult for her to wear a sterile gown, the conflict in testimony on this point would permit reasonable minds to view the issue of weight as a determining factor.

As a consequence, this Court must deny the Defendants' request for a JNOV on this issue because a jury, taking all reasonable factual inferences in Ross' favor, could find that her weight was a determining factor in the Defendants' decision. For this Court to conclude otherwise would require it to impermissibly weight the evidence. Thus, the JNOV request on this issue must be denied.

■ In the alternative, the Defendants seek a new trial on the weight issue. In evaluating this alternative request, the Court has far great flexibility than it would have in assessing the merit of a JNOV request.[42] In *National Polymer Products v. Borg Warner Corp.*,[43] the Sixth Circuit Court of Appeals wrote:

> A motion for a new trial is addressed to the sound discretion of the trial judge and when the judge has set the jury's

verdict aside as against the clear weight of the evidence, that action will not be disturbed unless the court has abused its discretion.

Unlike a JNOV motion, the Court may weigh the evidence in determining whether a new trial is, or is not, appropriate. This Court believes that a new trial on this issue is appropriate and necessary because the jury verdict was against the great weight of the evidence. In *Matras v. Amoco Oil Co.*,[44] the Michigan Supreme Court made clear that the appropriate inquiry is whether Ross' termination would have occurred even if the Defendants had not considered weight.

In this case, the Court believes that the clear preponderance of the evidence shows that her relationship with the Hospital would have been terminated even if the Defendants had not considered her weight. Ross' personnel file is replete with innumerable references to her behavior problems and, by comparison, very few references to her weight. The events, which precipitated the Defendants' action against Ross, related to her behavior. Her record of seven years of allegedly abusive behavior toward nursing personnel and some patients gave the Defendants a justifiable basis upon which to terminate her relationship with the Hospital.[45] Because the jury's verdict was against the clear weight of the evidence, the Court will order a new trial on this issue.[46]

---

**42.** *See Moran v. Johnsmansville Corp.*, 691 F.2d 811, 816 (6th Cir.1982).

**43.** 660 F.2d at 178.

**44.** *Supra* at n. 36.

**45.** Notwithstanding, Wilson's May 23, 1985 correspondence was an extremely sloppy and inartful effort to provide another justification for removing Ross on the basis of her behavior.

**46.** Defendants also maintain that a new trial is warranted because the jury instructions on this issue were deficient. Defendants claim that the instructions did not inform the jury that weight must have "made a difference" in the termination. It is true that the instructions did not use such language. However, the instruction regarding weight on page 34 informed the jury that if they found that the termination had been

"motivated" in whole or part by her weight or that there was intentional discrimination "because" of her weight, then the verdict should be for Ross. The instruction on page 49 stated that, "It is sufficient if Plaintiff is able to prove that discrimination played any part or was one of a number of considerations which *led* to the termination of her staff privileges" (emphasis added). Taken as a whole, this language appears to communicate to the jury that weight discrimination must be a factor which helped *lead* to the termination. This instruction has similarities to those which were upheld in *Kitchen v. Chippewa Valley Schools*, 825 F.2d 1004, 1011 n. 2 (6th Cir.1987) and *Selden Apartments v. HUD*, 785 F.2d 152, 161 (6th Cir.1986). On the other hand, the instruction also has some ambiguities that, *arguendo*, could have allowed a jury to find discrimination without weight being a "but-for" requirement. Because

#### 4. *Tortious Interference*

 Defendants also seek to set aside the jury's verdict on the tortious interference claim. They correctly point out that Ross must show (1) a valid advantageous relationship or expectancy existed between Ross and the Hospital, (2) Wilson and Murphy knew of the relationship between Ross and the Hospital, (3) Wilson and Murphy intentionally interfered with that relationship, causing its termination, and (4) the interference was wrongful.[47] Moreover, since Wilson and Murphy are affiliated with the Hospital, they can only tortiously interfere if they are not acting in the best interests of the corporation or are acting for a personal motive.[48]

This Court is very troubled by the nature of Ross' proofs on this issue. She argues, in essence, that Murphy was motivated by financial greed in his approach to her relationship with the Hospital because he would garner new patients by virtue of her termination. The Court is not satisfied that Ross has established a pecuniary motive nexus between Murphy's decision-making responsibilities as an officer of the Hospital and his role as a private practitioner. There was certainly no evidence that he needed this business. Moreover, it was Wilson—not Murphy—who took the lead in the termination decision.

However, if the jury finds that weight was a "but-for" cause during the new trial, then that decision would allow it to determine if Wilson and Murphy did, or did not, act for an impermissible motive. The Court will grant a new trial on the tortious interference issue because the great weight of the evidence supports the Hospital's position that Wilson and Murphy only had a good faith concern about the Hospital.

#### 5. *Miscellaneous Issues*

Ross' Motion for Reconsideration must now be regarded as moot because this Court has vacated the jury verdict upon which her requests for reinstatement are premised. In addition, the various Magistrate's Reports regarding prejudgment interest and attorney's fees are now moot and ineffectual because she has not prevailed on any claims.

Finally, the Hospital is now entitled to inform its personnel of this decision and withdraw the earlier letter that it issued under a previously issued Court Order, which is now vacated.

In summary, the Court (1) grants the Defendants' JNOV on both handicap claims, and (2) orders a new trial to be conducted on Ross' weight discrimination and tortious interference claims.

This Order shall not become effective for a period of ten (10) days from the date of filing.

IT IS SO ORDERED.

---

the Court has developed and relied upon other grounds for deciding the new trial request, this issue need not be definitely resolved.

**47.** *Northern Plumbing and Heating, Inc. v. Henderson Brothers,* 83 Mich.App. 84, 268 N.W. 2d 296 (1978).

**48.** *Tash v. Houston,* 74 Mich.App. 566, 254 N.W. 2d 579 (1979).